**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL J. MARTINEZ,<br>*Petitioner-Appellant*, | No. 15-16433 |
| v. | D.C. No.<br>CV 11-0572 AWI-MJS |
| MATTHEW CATE,<br>*Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Senior District Judge, Presiding

Argued and Submitted February 7, 2018
San Francisco, California

Filed September 11, 2018

Before: Sidney R. Thomas, Chief Judge, A. Wallace
Tashima and Morgan Christen, Circuit Judges.

Opinion by Judge Tashima

# SUMMARY[*]

## Habeas Corpus

The panel reversed the district court's denial of Daniel J. Martinez's habeas corpus petition challenging his California conviction for second-degree murder, and remanded.

The panel held that the only reasonable interpretation of what occurred between Martinez and an interrogating detective is that the detective continued interrogating Martinez after Martinez had clearly – and repeatedly – invoked his right to counsel, and that the detective badgered Martinez into waiving that right. The panel held that the California Court of Appeal's conclusion that the detective ceased interrogation and that Martinez's waiver of the right to counsel was valid is an unreasonable application of *Miranda v. Arizona*, 384 U.S. 436 (1966); *Rhode Island v. Innis,* 446 U.S. 291 (1980); *Edwards v. Arizona*, 451 U.S. 477 (1981); and related cases. In light of the *Edwards* violation, the panel further held that no reasonable court could have concluded that the government overcame its burden to show that Martinez's subsequent waiver was valid. The panel had grave doubts that the improper admission of Martinez's statements did not affect the verdict.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Gary P. Burcham (argued), Burcham & Zugman, San Diego, California, for Petitioner-Appellant.

Brian R. Means (argued), Deputy Attorney General; Tami M. Krenzin, Supervising Deputy Attorney General; Michael P. Farrell, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

Once a suspect invokes his right to counsel during custodial interrogation, the officer must immediately cease questioning and honor that right. In this habeas proceeding, we hold that the interrogating officer failed scrupulously to honor the suspect's right and that the California Court of Appeal unreasonably applied clearly established law in concluding otherwise. Further, we have grave doubts as to whether the admission into evidence of the suspect's improperly-obtained statements influenced the jury's verdict. We thus reverse the district court's denial of habeas relief, and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I.  Factual Background

#### A.  The Shooting

On December 8, 2005, Petitioner Daniel Martinez and Pablo Lopez had a neighborhood confrontation with Jefte and Jair Garcia that left Jefte dead from a gunshot wound.[1]

There are differing accounts of the shooting, but the basic facts are as follows.  Martinez and Lopez's neighborhood included residents claiming membership in the rival Norteño and Sureño gangs.  The Garcia brothers claimed Sureño membership; Martinez and Lopez allegedly claimed Norteño. On December 8, 2005, Martinez and Lopez knocked on a companion's door and retrieved a shotgun stored there.  One companion testified that Martinez asked for "the gauge," referring to the shotgun.  Lopez put the gun behind his back and started to walk down the driveway with Martinez.  Two companions from the house followed Lopez and Martinez. Halfway down the driveway, Martinez and Lopez started exchanging words with the Garcia brothers, who were across the street.  The brothers accused Lopez and Martinez of tagging "YGL," which stands for "Young Gangster Locos," on the sidewalk outside of the brothers' house.  Jefte took his shirt off and walked to the middle of the street.  Both of Lopez and Martinez's companions thought that Jefte wanted to fight.  Additionally, one of the companions testified that Jair threatened, "I'll peel your guys' cap back," meaning he was going to shoot at them, but there was no consensus about

---

[1] The facts are adopted from the California Court of Appeal's decision and, pursuant to 28 U.S.C. § 2254(e), presumed to be true.

whether the Garcia brothers referred to having a gun. The two companions' recollections also differed as to whether Martinez said anything to Jefte or Lopez while Jefte was shirtless in the middle of the street. One companion testified that Jair reached behind his back during the confrontation. The other companion did not hear the brothers threaten to shoot at Lopez and Martinez, and did not see a weapon on the Garcia brothers. Lopez eventually produced the shotgun from behind his back and almost immediately fired it once. Jefte was facing the weapon when he was shot. One of the companions testified that Martinez had told Lopez to "[j]ust do it" right before Lopez fired. Martinez, Lopez, and their two companions ran.

Afterwards, Martinez hid out at a nearby house and bragged that he had "shot this fool, shot this scrap."**[2]** Two days later, the police arrested Martinez.

## B.  The Interrogation

On December 10, 2005, at approximately 7:00 p.m., Detective Navarro interrogated Martinez. In the interview room, Detective Navarro uncuffed Martinez, got him some water, took some biographical information and said,

> I want to talk to you about the shooting last night or two nights ago . . . . I know what happened already OK . . . .  I really want to get your side of the story.  I only have one side of the story right now. OK. UH from the guys across the street, the Sureños.

---

**[2]** "Scrap" may be a derogatory term for Sureño members.

Detective Navarro then read Martinez his *Miranda* rights.

Immediately after hearing his *Miranda* rights, Martinez asked, "I can have an attorney?"  Detective Navarro clarified whether Martinez wanted an attorney and Martinez stated, "I would like to have an attorney."  Without a break, Detective Navarro asked Martinez if he already had an attorney (yes), what his attorney's name was (Percy), whether Martinez had already spoken to Percy (no), and whether Martinez would talk "but with an attorney present?"  To the last question, Martinez replied "yeah [] cuz [sic] I don't know much about the law."  Detective Navarro then questioned Martinez about Martinez's father's full name.  After Martinez answered, the following interaction took place:

> **MARTINEZ:**  Alright.  I'm willing to talk to you guys uh but just I would like to have an attorney present.  That's it.

> **NAVARRO:**  Yeah, I don't know if we could get a hold of him right now.

> **MARTINEZ:**  Yeah.

> **NAVARRO:**  All I wanted was your side of the story.  That's it.  OK.  So, I'm pretty much done with you then.  Um, I guess I don't know another option but to go ahead and book you.  OK.  Because

> **MARTINEZ:**   What am I being booked under?

**NAVARRO:** Your[3] going to be booked for murder because I only got one side of the story. OK.

**MARTINEZ:** But how how's he going to go about that. If we talk, once you get a hold of my uh attorney.

**NAVARRO:** That's the thing, I don't know when were going to get a hold of him. Maybe I don't know when he's going I don't know when your going to call him.

**MARTINEZ:** I have to get a hold of him.

**NAVARRO:** Huh?

**MARTINEZ:** I have to get a hold of him?

**NAVARRO:** Yeah.

**MARTINEZ:** You guys don't (unintelligible)

**NAVARRO:** No. No, your going to have to call him and it's going to have to be from jail.

---

[3] The transcript of the interrogation contains several typographical errors. Where we quote extensive portions of the transcript, we reproduce the interrogation as recorded, rather than entering "[sic]" after each one. Where the transcript included [sic] we have omitted the designation for readability.

After Martinez expressed frustration about the situation, he asked the detective, "what did you want to talk to me about?" At which point Detective Navarro said that he wanted to talk about the shooting and asked if Martinez "want[s] the attorney," or whether Martinez did not care. Martinez and Detective Navarro went back and forth a bit, with the detective saying he wanted Martinez's side of the story and Martinez saying he did not want to go to jail and that he would tell the truth if that "help[ed] [him] walk away."

Without an attorney present, Detective Navarro continued to interrogate Martinez. At trial, Detective Navarro testified that he asked Martinez whether Martinez felt intimidated by Jefte during the confrontation, and whether Martinez saw a gun on Jefte. Detective Navarro testified that Martinez said he did not feel threatened and did not see a gun.

## II. Procedural Background

### A. Trial

Martinez did not file a pre-trial motion to suppress the statements from Detective Navarro's interrogation. Instead, during trial, the defense objected to admission of the statements on Fifth Amendment grounds and the trial judge held a sidebar with counsel to discuss the matter. The trial judge concluded that although Martinez invoked the right to counsel, Navarro ceased interrogation. Then, in the eyes of the trial judge, Martinez reinitiated conversation and voluntarily waived his previously-asserted right to counsel. Specifically, the trial judge determined that questions about Martinez's attorney and about Martinez's father were not improper questions after Martinez's invocation, but were

instead part of the booking process. Further, the trial judge concluded that nothing that Detective Navarro said after Martinez's invocation was a "threat" that "would invalidate [Martinez] changing his mind on the invocation." The trial judge did highlight Detective Navarro's statement that he was going to book Martinez "because [he] only got one side of the story" as the most "critical" issue that "might jeopardize" admission of Martinez's responses. Nonetheless, the judge concluded that the questions after Martinez's invocation were valid, and that Martinez's change of heart was voluntary. The trial judge refused to suppress the statements.

During closing argument, the prosecution cited Martinez's responses to Detective Navarro's questioning to rebut a self-defense instruction. The prosecution argued that Martinez's statements that "he didn't see a gun" and "didn't feel threatened" were "critical" to "self-defense and dropping a murder [conviction] to manslaughter . . . ."

The jury convicted Martinez of second-degree murder and active gang participation but "also expressly found that Martinez 'did act intentionally, deliberately and with premeditation.'" Therefore, the jury did not accept Martinez's self-defense argument. Martinez was sentenced to 40 years to life imprisonment.

## B. Direct Appeal

On direct appeal, Martinez challenged the admission of the statements. The California Court of Appeal reviewed the interview transcript and affirmed the trial court's ruling that Martinez's statement was admissible. The court focused its analysis on whether Detective Navarro telling Martinez that

he would need to contact his lawyer from jail rendered his waiver involuntary.

First, citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Court of Appeal found that "once Navarro clarified that Martinez was willing to talk to him, but wanted an attorney present, interrogation ceased. The questions Navarro asked concerning Martinez's father did not constitute interrogation." Second, the court reasoned that "[i]t was Martinez who then turned the subject back to having an attorney present; we see nothing deceptive or coercive in Navarro's response that he did not know if they could get hold of Martinez's attorney." Third, the court interpreted Martinez's "question about what he was being booked for" as a reinitiation of the conversation with Detective Navarro. Fourth, the court concluded that "[t]here was nothing inappropriate or misleading in Navarro's telling Martinez that Martinez would have to call his lawyer from jail." Finally, the court noted that "[a]fter Martinez asked what Navarro wanted to talk about, Navarro proceeded to make certain that Martinez was waiving his right to counsel." The court did not explicitly discuss whether it considered Martinez's waiver voluntary, knowing, and intelligent, but this must have been its conclusion.

The California Supreme Court summarily denied Martinez's petition for review.

## C. Habeas Proceedings

Martinez filed a petition for writ of habeas corpus in the Stanislaus County Superior Court, which denied the petition, "find[ing] that all the issues raised in the writ were appropriately considered by the [California Court of Appeal],

or if not, could have been." Subsequent petitions to the California Court of Appeal and California Supreme Court were summarily dismissed.

Martinez then filed his federal habeas petition. A magistrate judge issued Findings and Recommendations, recommending that the district court deny Martinez's claim that "his *Miranda* rights were violated based on continued questioning after he invoked his right to an attorney." In recommending that the district judge deny the petition, the magistrate judge noted that the conversation between Martinez and Detective Navarro "could be interpreted in multiple ways." On one hand, the magistrate judge wrote that a "fair-minded jurist could find that the officer continued to interrogate" Martinez after he had invoked his right to counsel because "the officer may have used the coercive pressure of booking Petitioner in jail to obtain a waiver of his right to counsel." On the other hand, the Findings and Recommendations concluded that "the state court's determination is equally plausible. . . . [T]elling Petitioner that if the interrogation were over, he would be booked is informative in nature, and likewise may not be considered as [continued] interrogation."

Somewhat contradicting the conclusion that the state court's determination was "equally plausible," the magistrate judge also "note[d] that the officer did more here than just inform Petitioner that he was going to be booked." In doing so, the magistrate judge recognized that the officer may have "create[d] the potential implication that if Petitioner was to talk then he might not be booked." Nevertheless, because "fairminded jurists could disagree" over the interpretations, the magistrate judge recommended denying the petition, but granting a Certificate of Appealability.

The district court adopted the Findings and Recommendations denying the petition and issued a Certificate of Appealability as to Martinez's *Miranda* claim.

## STANDARD OF REVIEW

We review *de novo* the district court's denial of Martinez's habeas petition, and we review the district court's findings of fact for clear error. *See Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014).

When, as here, we conclude that a state court committed a constitutional error during a criminal trial, we "must assess the prejudicial impact of [the error] under the 'substantial and injurious effect' standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)." *Fry v. Pliler*, 551 U.S. 112, 114 (2007). This is true even "when the state appellate court failed to recognize the error and did not review it for harmlessness." *Id.*; *see also Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008).

"In conducting our review, we look to the last reasoned state-court decision." *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003). Here, the parties agree that the relevant decision is the California Court of Appeal's decision on direct appeal.

## DISCUSSION

Martinez's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). AEDPA "restricts the circumstances under which a federal habeas court may grant relief to a state prisoner whose claim

has already been 'adjudicated on the merits in State court.'" *Johnson v. Williams*, 568 U.S. 289, 292 (2013) (quoting 28 U.S.C. § 2254(d)). Under AEDPA, this court may only grant habeas relief if a state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

We first consider whether to review Martinez's claims *de novo* or whether to accord the California court the required deference. Decisions that are not "adjudicated on the merits" are not subject to AEDPA deference. *See Johnson*, 568 U.S. at 292. At oral argument, there was some discussion about whether the state court `reached the merits of one of Martinez's arguments – namely, that Navarro continued interrogation by telling Martinez that he would be booked *because* he was not talking. But, Martinez had never previously asserted that the state court failed to adjudicate his claims on the merits and thereby abandoned the issue. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009). Regardless, there is a strong presumption that the California Court of Appeal reached the merits of Martinez's *Miranda* claim and Martinez did not rebut this presumption. *See Johnson*, 568 U.S. at 301–02. Further, just because the California Court of Appeal did not explicitly state that the booking comments were not interrogation, we presume it concluded as much in remarking "[i]n our view, once Navarro clarified that Martinez was willing to talk to him, but wanted an attorney present, *interrogation ceased*."

Martinez also asserts that we should review his legal claims *de novo* because the California Court of Appeal's decision was based on an unreasonable determination of facts. We think the court reasonably determined the facts. Martinez contends that the state court's "focus was improperly narrow" because it did not explicitly discuss Navarro's statements about booking Martinez based on his unwillingness to talk. However, the Court of Appeal included the relevant portion of the transcript in its decision and presumptively read it. That the Court of Appeal did not discuss Navarro's statements about booking Martinez in its analysis section is not a factual error; rather, the court made a legal determination that those statements did not rise to the level of interrogation. We therefore review the Court of Appeal's decision with the requisite AEDPA deference.

## I.   *Miranda* **and its Progeny**

*Miranda v. Arizona* and its progeny provide the clearly established law upon which Martinez's petition is based. Among the many safeguards that *Miranda* established for criminal defendants, one is the express "right to have counsel present" during a custodial interrogation. 384 U.S. 436, 469 (1966). *Miranda* described this right as "indispensable" to the protection of the Fifth Amendment privilege against self-incrimination. *Id.*

Building on *Miranda*, *Edwards v. Arizona* set out the analysis that courts must follow when a defendant has invoked his right to counsel. 451 U.S. 477, 482–86 (1981). First, *Edwards* explained that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Id.* at 482. *Edwards* then held that "a valid

waiver of that right cannot be established by showing only that [a suspect] responded to further police-initiated custodial interrogation." *Id.* at 484. Finally, *Edwards* established the rule that once an accused invokes the right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. *Arizona v. Roberson* then articulated some of the reasoning behind the *Miranda* and *Edwards* rule:

> [I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest . . . is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect.

486 U.S. 675, 681 (1988) (internal quotation marks omitted). This line of cases "thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

The prophylactic rule set out in *Edwards* is limited by two principles. First, the suspect can counteract his own invocation of the right to counsel by "initiat[ing] further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. A suspect "evinc[ing] a willingness and a desire for a generalized discussion about the investigation[,]" including asking "what is going to happen to me now?" is sufficient to initiate further discussions with the police. *See Oregon v. Bradshaw*,

462 U.S. 1039, 1045–46 (1983) (plurality opinion) (Rehnquist, J.). But, initiating further discussions is not sufficient to admit a defendant's responses. "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (citing *Edwards*, 451 U.S. at 485–86, n.9).

Second, the rule in *Edwards* does not apply to all interactions with the police – it applies only to custodial interrogation. *Edwards*, 451 U.S. at 486. In other words, not all communications with the police after a suspect has invoked the right to counsel rise to the level of interrogation. "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id.* at 300–01.

## II. Martinez's *Miranda* Claim

The parties agree that Martinez unequivocally invoked his right to counsel. We therefore review whether Detective Navarro continued interrogating Martinez in violation of *Edwards*, and whether Martinez's statements are nonetheless admissible. We hold that the only reasonable interpretation of what occurred between Navarro and Martinez is that Navarro continued interrogating Martinez after the suspect had clearly – and repeatedly – invoked his right to counsel, and that Navarro badgered Martinez into waiving that right. The California Court of Appeal's conclusion that Navarro

ceased interrogation and that Martinez's waiver of the right to counsel was valid is an unreasonable application of *Miranda*, *Innis*, *Edwards*, and related cases.  In light of the *Edwards* violation, we further hold that no reasonable court could have concluded that the government overcame its burden to show that Martinez's subsequent waiver was valid.

## A.  Detective Navarro Continued Interrogation

### 1.  *Express Questioning*

As noted above, *Innis* defined "interrogation" as either express questioning or its functional equivalent.  446 U.S. at 300–01.  We first review whether Martinez was subject to express questioning that rose to the level of interrogation.

*Innis* recognizes that not all questions constitute interrogation.  Specifically, *Innis* exempts words and actions that are "normally attendant to arrest and custody" from the definition of interrogation.  *Id.* at 301.  Thus, "[t]he so-called 'booking questions exception' exempts 'from *Miranda*'s coverage [express] questions to secure the biographical data necessary to complete booking or pretrial services.'"  *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir. 2016) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion)).  Questions about the defendant's "name, address, height, weight, eye color, date of birth, and current age" fall within the *Miranda* exception.  *Muniz*, 496 U.S. at 601.

Immediately after Martinez requested an attorney, Detective Navarro asked the defendant questions about whether he already had a lawyer.  Although these are express questions, it is reasonable to conclude that the questions were

"attendant to arrest" and that a reasonable officer would not have known that this line of questioning was "likely to elicit an incriminating response." *Innis*, 446 U.S. at 301.

Likewise, the Court of Appeal's conclusion that asking about the name of Martinez's father was not interrogation is reasonable because Detective Navarro could have just been eliciting biographical information. Therefore, a fairminded jurist could conclude that these questions were attendant to booking.

### 2.  *Functional Equivalent of Express Questioning*

Next, we turn to whether Detective Navarro's statements after Martinez invoked his right to counsel constituted the functional equivalent of express questioning. The functional equivalent of interrogation is defined as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. This definition "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," but is an objective standard such that the police "cannot be held accountable for the unforeseeable results of their words or actions." *Id.*

After Detective Navarro told Martinez that he was not sure if his lawyer was available, Detective Navarro stated, "[a]ll I wanted was your side of the story. That's it. OK. So, I'm pretty much done with you then. Um, I guess I don't know another option but to go ahead and book you. OK. Because . . . ." Martinez cut in, "[w]hat am I being booked under?" to which Navarro replied "[y]our [sic] going to be booked for murder because I only got one side of the story. OK."

The California Court of Appeal did not explicitly analyze whether Detective Navarro's two statements about booking Martinez constituted interrogation. Instead, the Court of Appeal stated, "[i]n our view, once Navarro clarified that Martinez was willing to talk to him, but wanted an attorney present, interrogation ceased." In the absence of any reasoning from the state court, the magistrate judge's Findings and Recommendations attempted to provide the best justification for the California court's conclusion that the statements about booking were not interrogation: "telling Petitioner that if the interrogation were over, he would be booked is informative in nature, and likewise may not be considered as interrogation." Under this justification, Detective Navarro's statements would be "attendant to arrest" and exempted from the definition of interrogation. However, this is an unreasonable application of the law to the facts because it does not reflect the correct standard for "interrogation" because it fails to consider the likely effect of the words on the listening suspect – particularly the words "[y]our [sic] going to be booked for murder because I only got one side of the story." Any reasonable officer would know that these particular statements about booking would likely elicit a response.

We think the only reasonable interpretation of (1) "all I wanted was your side of the story. That's it. OK. So, I'm pretty much done with you then. Um, I guess I don't know another option but to go ahead and book you. OK. Because," and (2) "your [sic] going to be booked for murder because I only got one side of the story. OK," is that the statements, in context, constitute interrogation. Again, the magistrate judge summed up the issue succinctly: "the officer did more here than just inform Petitioner that he was going to be booked. The officer's statements . . . create the potential implication

that if Petitioner was to talk then he might not be booked." Our only issue with the magistrate judge's observation is the word "potential" – we would replace it with "inescapable."

The clearest evidence of the interrogating nature of Detective Navarro's statements is their plain language. By stating, "your [sic] going to be booked for murder *because* I only got one side of the story," Detective Navarro causally links Martinez's assertion of his constitutional right to the detective's decision to book the suspect for murder. The obvious implication of that linkage is that if Martinez were to give his side of the story, by waiving his just-invoked right to counsel, he will not be booked, or not be booked for murder. At the very least, the detective should know that his statement would be perceived this way and was "reasonably likely to elicit an incriminating response." *See Innis*, 446 U.S. at 302.

Further, Detective Navarro's statements to Martinez were not definitive: "Im [sic] *pretty much* done with you then;" and "*I guess I don't know* another option but to go ahead and book you." (Emphasis added.) Saying that you are "pretty much" done with someone or that you "guess you don't know another option" strongly implies that you are not *completely* done with someone or that no other option *exists*. The obvious implication is that Detective Navarro only had to book Martinez *if* he did not give his side of the story. Conversely, Navarro implied that, if Martinez gave his side of the story, Navarro might have alternative options to booking the suspect.[4]

---

[4] Detective Navarro's statements are also improper in that they implied Martinez would be punished for asserting his constitutional right to counsel. *See Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("while it is true that the *Miranda* warnings contain no express assurance that silence will

The State argues that Detective Navarro telling Martinez that he was booking the suspect, or that he had no option but to book the suspect, was merely "attendant to arrest and custody," and "inform[ed] [Martinez] of circumstances which contribute[d] to an intelligent exercise of his judgment." However, this argument ignores the causal link in Navarro's statements. Telling Martinez that he was being booked *because* he did not give his side of the story is different than an officer setting out the charges and the evidence against the suspect. *See United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (holding that an officer telling a suspect that the police had seized 600 pounds of cocaine, that the suspect was in serious trouble, and that the detective would like to talk to the suspect after the suspect had spoken to an attorney, was not interrogatory); *see also Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989).

The State also argues that Detective Navarro's statements about booking Martinez were just informational and were "recounting what had occurred previously in their conversation." Beyond not offering any possible explanation about why Navarro would need to recount the conversation, this interpretation is also unreasonable because it ignores the causal nature of Detective Navarro's statements.

We cannot ignore the implications of Navarro's statement because the *Innis* test explicitly calls for considering the "perceptions of the suspect, rather than the intent of the police." 446 U.S. at 301. Thus, even if Detective Navarro only intended to recount what had happened during the conversation, and in no way thought that he was booking Martinez *because* he did not give a statement, the court must

carry no penalty, such assurance is implicit").

still consider how a suspect would perceive the statements. The California Court of Appeal failed to do this. Further, how a suspect reacts to a statement can provide evidence of how the suspect perceived the statement.

Here, Martinez responded as if he were being asked to give a statement, and that by doing so he would be able to avoid booking. After Navarro told Martinez "[y]our [sic] going to be booked for murder because I only got one side of the story," Martinez responded "how's he going to go about that. If we talk once you get a hold of my uh attorney." Later, Martinez made multiple references to being willing to talk to avoid jail:

> **MARTINEZ:** I just you know I'm tired of going back and forth to jail. And if that's the charge I mean you go, you don't get the choice to go back and forth you know so.

> **NAVARRO:** Uh hmm. It's up to you. Do you want to talk or you want me to sit down?

> **MARTINEZ:** Yeah. I mean I'm willing to talk to you, you know what I mean but

> **NAVARRO:** With the truth?

> **MARTINEZ:** Shit, if that's what helps me walk away.

> **NAVARRO:** Your young man. Just be honest.

**MARTINEZ:** Honest, the truth I'm just trying to go through this and be able to walk home and

**NAVARRO:** So do you want to talk to me so I could sit down or what do you want to do?

**MARTINEZ:** Yeah.

**NAVARRO:** Yeah. OK. You don't you don't want Percy then right now? Right? You don't want Percy?

**MARTINEZ:** Well, If I I mean

**NAVARRO:** You don't you don't want an attorney right now? Your willing to talk to me right now? I want to clarify that.

**MARTINEZ:** Yeah.

**NAVARRO:** OK.

**MARTINEZ:** I'm willing.

Martinez's willingness to talk after Detective Navarro's statements, and Martinez's multiple references to avoiding jail, suggest that he perceived Detective Navarro's statements as suggestions that he might not be booked if he talked.

Because Navarro continued to interrogate Martinez after Martinez had invoked his right to counsel, Navarro violated the clearly-established rule from *Edwards*. It was an

unreasonable application of *Innis* and *Edwards* to conclude otherwise.

### B.  Martinez's Statements are not Admissible

After finding an *Edwards* violation, we next assess whether the incriminating statements were nonetheless admissible.  To be admissible, Martinez would (1) have needed to initiate further communication with the police, and (2) voluntarily, knowingly, and intelligently waived his previously-invoked right.

First we analyze whether Martinez initiated further discussion with Navarro. The government argues that Martinez initiated further conversation by asking, "[w]hat am I being booked under?"  The California Court of Appeal also suggested that Martinez's question may have "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation." (Quoting *Bradshaw*, 462 U.S. at 1045–46.)

No fairminded jurist could interpret Martinez's statement as a re-initiation of the conversation.  For one, the conversation between Navarro and Martinez never stopped. Initiate means "to begin" and no reasonable jurist could review the transcript of the interaction between Detective Navarro and conclude that Martinez *began* the exchange about being booked for murder.  *Initiate*, *Oxford English Dictionary Online* (3d ed. 2018).  In fact, Detective Navarro was mid-sentence when Martinez asked his question.

Similarly, Martinez's question "what did you want to talk to me about?" also came in the same conversation. In every other case where the Supreme Court has held that a defendant initiated the communication with the police, there was some break in questioning. *See Bradshaw*, 462 U.S. at 1042 (describing that "[t]he officer immediately terminated the conversation" before the defendant initiated communication "[s]ometime later"); *Wyrick v. Fields*, 459 U.S. 42, 44–45, 47 (1982) (per curiam) (holding that where a defendant was released from custody, met with counsel, and requested a polygraph examination, the defendant "initiated interrogation"). Further, Martinez's question was a direct response to Navarro's assertion that he had to book Martinez because he would not talk. The detective's statements linking Martinez's booking to his invocation of the right to counsel, and the detective's comments that Martinez would need to call his own attorney from jail are exactly the type of badgering that *Edwards* was crafted to prevent.

Second, even if Martinez did reinitiate, his statements are not admissible because in light of the *Edwards* violation it is presumed that Martinez's waiver of his right to counsel was invalid. *See Roberson*, 486 U.S. at 681. The California Court of Appeal did not explain its waiver analysis, simply stating that "Navarro proceeded to make certain that Martinez was waiving his right to counsel and did not want to have an attorney, or his attorney, present."

No fairminded jurist could review this record, conclude that the State overcame the *Edwards* presumption, and hold that Martinez's waiver was voluntary. First, Martinez's responses to Navarro's questions in themselves do not constitute a valid waiver. *See Edwards*, 451 U.S. at 484 ("[W]hen an accused has invoked his right to have counsel

present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."). Next, although Navarro told Martinez that it was up to him to decide whether to talk, the context of the encounter cannot be ignored. This happened in the same conversation in which Navarro told Martinez that he was being booked because he would not talk, in the same conversation where Martinez expressed multiple times that he wanted a lawyer, and in the same conversation where Martinez said he was just trying to avoid getting booked. Detective Navarro's last two statements to Martinez before he finally relented are illustrative:

> **NAVARRO:** Yeah. OK. You don't you don't want Percy then right now? Right? You don't want Percy?
>
> **MARTINEZ:** Well, If I I mean
>
> **NAVARRO:** You don't you don't want an attorney right now? Your willing to talk to me right now? I want to clarify that.

Martinez's response under Navarro's pressure is still equivocal: "[w]ell, if . . ." Martinez was still trying to assert his right to counsel as Navarro peppered him with questions. This is not indicative of a voluntary waiver.

Navarro never honored Martinez's invocation of his right to counsel and kept talking until he got the answer he wanted. He never gave Martinez more than a few moments. Ultimately, because custodial interrogation never stopped, the only reasonable interpretation of Navarro's responses to

Martinez's invocation of the right to counsel is that the detective was "badgering [the] defendant into waiving his previously asserted *Miranda* rights." *Harvey*, 494 U.S. at 350. In light of the *Edwards* presumption, the only reasonable conclusion is that Martinez's waiver "c[a]me at the authorities' behest . . . [and] is itself the product of the 'inherently compelling pressures'" of Navarro's custodial interrogation. *See Roberson*, 486 U.S. at 681.

## III.     Prejudice

Our conclusion that no reasonable jurist would have found Martinez's waiver valid does not end the inquiry. Martinez is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht*, 507 U.S. at 637 (internal quotation marks omitted)). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict."'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Martinez contends that the admission of his statements that he (1) did not see a gun on the Garcia brothers, and (2) did not feel threatened influenced the jury's verdict because they rebutted his self-defense argument. Notwithstanding the admission of the statements, the State counters that Martinez was not prejudiced because it presented "overwhelming evidence" of Martinez's guilt. Additionally, the government contends that the admission of the interrogation statements allowed Martinez to introduce evidence that he was intoxicated, which could have lowered Martinez's level of intent.

We at least have grave doubt whether the admission of Martinez's statements substantially affected the jury's verdict.  During closing argument, the prosecutor stated:

> Daniel Martinez two days later, what critical, critical statement made by Daniel Martinez, to Detective Frank Navarro, "I didn't see a gun. No, I didn't feel threatened." Critical statements made to the detective investigating the homicide which shoots the alibi in the foot. This is one of the two participants in the murder who says, "I didn't see a gun and I didn't feel threatened." You must show eminent threat of death or bodily injury in order to justify shooting and killing somebody for self-defense.

> Imagine for a second if this instruction was not present. You heard this referenced at least three times. This was the – this instruction is applicable to self-defense and dropping a murder to manslaughter and a manslaughter to attempted voluntary manslaughter. It's a defense.

The prosecutor continued, arguing that fear of some indefinite future harm is not sufficient:

> That's why that cannot be recognized as a valid self-defense. You cannot allow people to go out and kill by saying and justifying it:  I have to. They're going to get me, future harm. That's why the law's written the way it is.

Daniel Martinez said, "I didn't see a gun, and
I didn't feel threatened."

The prosecutor's focus on rebutting Martinez's self defense argument, and especially Martinez's admission that he did not feel threatened, demonstrates how important the prosecutor thought this evidence was for the State's case. In fact, he called Martinez's statements "critical" and repeated them twice. If the prosecutor thought that the statements were critical for his case, he must have believed that they could have "substantially swayed" the jury. *See Sessoms v. Grounds*, 776 F.3d 615, 630 (9th Cir. 2015) (en banc). Further, returning to an argument in closing "again and again and telling jurors it was 'very important evidence'" bolsters the likelihood that the evidence affected the jury. *See id.*; *see also Rodriguez*, 872 F.3d at 926 (highlighting the prejudicial effect of the government's reliance in closing argument on a theory first brought up during an improper interrogation).

Just as important, "[t]he prejudice from [a defendant's] confession cannot be soft pedaled." *Anderson v. Terhue*, 516 F.3d 781, 792 (9th Cir. 2008) (en banc). "A confession is like no other evidence; it may be the most damaging evidence that can be admitted against a defendant." *Garcia v. Long*, 808 F.3d 771, 782 (9th Cir. 2015) (internal quotations and alterations omitted) (citing *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)). As such, this court must "[e]xercis[e] extreme caution . . . before determining that the admission of a confession at trial was harmless." *Jones v. Harrington*, 829 F.3d 1128, 1142 (9th Cir. 2016) (internal quotation marks and alterations omitted (citing *Fulminante*, 499 U.S. at 296)).

The State's arguments that the admission of the statements did not prejudice Martinez do not soothe our doubt. First, the State argues that "there was overwhelming evidence of Petitioner's guilt, including his bragging confession [to a companion] that 'I shot this fool, man. I smoked his ass. Shot that fucking scrap.'" In bringing this statement up during closing, the government asked and answered, "[w]hat do gang members do after committing a crime . . . gang members brag." But, Martinez's boasts say nothing about whether he shot in self-defense. In fact, Martinez did not even do any shooting – Lopez did – meaning that Martinez's entire statement could be empty bragging, and we think it entirely reasonable that a jury could so conclude. In other words, we do not think the bragging is "overwhelming evidence" that Martinez did not feel threatened.

The prosecution's other evidence that Martinez or Lopez did not see a gun is weak. The prosecutor argued that Lopez had time to come up with the story about seeing the revolver, that Lopez's statements to Detective Navarro were inconsistent, that Jair Garcia said he did not have a gun on the 911 call, and that no gun was found on the Garcia brothers. The prosecutor brought up these arguments at the same time he was repeating Martinez's statements in closing. But in the absence of Martinez's statements, the governments rebuttal of self-defense is considerably weaker. For one, the time that elapsed before Lopez told the detective that he saw a gun is not evidence, it is an argument. Further, the fact that there was no gun does not rebut the claim that Lopez or Martinez thought they saw a gun, or that the Garcia brothers threatened to shoot them. Detective Navarro testified that Lopez told him he felt it was going to be "them or him" and was "scared for is life." Although the State introduced testimony from

one of the companions, who told the jury that he did not see a gun on the Garcia brothers, the perceptions of that witness were seriously undermined because he also said that Jefte turned and ran when he saw Lopez's gun, but the autopsy showed that Jefte was facing Lopez when he was shot. In sum, all of the other evidence rebutting self-defense is equivocal or circumstantial. Martinez's improperly-admitted statements were clear and damning; they were the backbone of the State's argument against self-defense. Thus, we have grave doubts that their admission did not affect the verdict.[5]

## CONCLUSION

It is clear that Navarro ignored Martinez's express, unequivocal, and repeated invocations of his right to counsel and badgered him into waiving his rights. Accordingly, we **REVERSE** and **REMAND**. Unless the State of California elects to retry Martinez within a reasonable period of time to be determined by the district court, the district court shall issue the writ granting Martinez's habeas petition.

---

[5] We are not convinced by the State's speculation that admission of Martinez's statements somehow helped him because it allowed him to make a voluntary intoxication argument. There was no instruction about voluntary intoxication and no discussion of it in closing argument.