JAMES, J.
*68 *704 Defendant appeals a judgment of conviction for manslaughter in the first degree, ORS 163.118, and possession of a destructive device, ORS 166.382. After the trial court denied defendant's motion to suppress, he entered a conditional guilty plea to both charges while reserving his right to appeal the denial of his motion. ORS 135.335(3). On appeal, he assigns error to the trial court's denial of his motion to suppress, arguing that the detectives unlawfully interrogated him in violation of both Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution after he unequivocally invoked his right to counsel. In response, the state contends that the trial court did not err in denying defendant's motion, because defendant initiated further conversation with the detectives and waived his previously invoked right to counsel. We conclude that defendant's incriminating statements that followed his invocation of the right to counsel were not the product of unlawful interrogation by the detectives and that defendant initiated further conversation with the detectives in a manner that evinced a willingness and a desire for a generalized discussion about the charges, preceding his valid waiver.[1] Accordingly, we affirm.
We review the denial of a motion to suppress for legal error and are bound by the trial court's findings of fact if evidence in the record supports them. State v. Ehly , 317 Or. 66, 75, 854 P.2d 421 (1993). We state the following facts in accordance with that standard.
In the course of a homicide investigation, Clackamas County Sheriff's Office Detectives Smith and Miller came to believe that defendant was involved in a fatal stabbing and sought to interview him while he was in the Clark County Jail in Washington. Smith and Miller read defendant his rights and, after some discussion with the two detectives, defendant asked if they could continue talking with the video *705 recorder off. The detectives explained that the interrogation must be taped in order to preserve an accurate account of what was said. In response, defendant stated, "Well, then I want a lawyer" and "I got nothing else to say." The detectives asked defendant if he already had a lawyer and defendant stated he had not yet retained one. Miller then informed defendant that he was being charged with murder, that he would be extradited back to Oregon, and that Miller would submit the paperwork that day. The detectives, responding to defendant's earlier request to continue the conversation without the video recorder, explained that, although they had accommodated requests to speak off video in the past, they could not talk to defendant without recording the conversation because "you've already talked about you want an attorney. So I'm not going to ask you questions about the interview or about anything that's going to incriminate you." The detectives then stated they were ending the interrogation and turning off the recorder, saying that "we'll head out" and "we'll tell them we're done with the interview, okay?"
The detectives did not actually leave or turn off the recorder because defendant started asking them questions. Defendant asked them how soon he would be extradited back to Oregon and they estimated that it could take a couple of days to a week. Defendant then asked them if the case was "going federal" and they responded that they did not know but probably not. Defendant then asked what kind of time he would face if he was found guilty and Miller stated that the process was based on defendant being charged with aggravated murder. Defendant responded that he did not understand what aggravated murder meant. Smith interrupted Miller and explained to defendant that they needed to "kind of stop the interview" because the detectives were not allowed to chit chat with defendant after he had asked for an attorney. Defendant interrupted Smith to ask if defendant's girlfriend knew he was being charged and the detectives responded that she will know. Defendant made it clear *69 that he did not want her caught up in the case, and Miller said it depends on how involved she is; Smith stated, "We have to stop there" and Miller said, "Yeah."
At that point, defendant asked, "Well can I unask for a lawyer[.] I just want [girlfriend] to be out there staying *706 with my kid[.] I'll talk with you guys if you agree to leave her out of this." Smith started to explain again to defendant that he had already asked for an attorney and defendant interrupted him to say, "I'll talk to you guys if ... if you agree to leave her out of this." (Ellipsis in original.) Smith immediately responded:
"[DETECTIVE SMITH]: We ... no. I mean-
"[DEFENDANT]: I know you guys can't-
"[DETECTIVE SMITH]: We can't ... We cannot make ... I'm not ... I don't ... I'm going to be upfront with you. I'm not going to play games with you at all. I didn't play games with you before and I'm not going to now. You have asked for an attorney. If you want us to sit in here and talk to you more about this case or anything else, we need to be very clear that you no longer want an attorney and you want to talk to us."
(Ellipses in original.) Defendant then looked directly into the camera and said, "Right. I do not want an attorney any longer. I am willing to talk to you guys." The detectives reminded defendant that if, at any point, he wants an attorney the detectives will stop the questioning, stating that they "need to be clear that if you want an attorney at any point, from this [point] on you can tell us that. And we will stop questioning you." At that point, the detectives asked, "So what ... what is your question?" (Ellipses in original.) After discussing defendant's girlfriend, the victim, and the events that led to the victim's stabbing, defendant confessed to stabbing the victim.
Defendant entered a conditional guilty plea to one count of manslaughter in the first degree, ORS 163.118, and one count of possession of a destructive device, ORS 166.382. The trial court denied defendant's pretrial motion to suppress statements he made to the detectives after invoking his right to counsel. Defendant's conditional guilty pleas reserved his right to appeal the trial court's denial of his motion to suppress. See ORS 135.335(3).
On appeal, defendant argues that he was interrogated in violation of his right against compelled incrimination under Article I, section 12, and the Fifth Amendment. Specifically, he argues that the detectives violated those *707 rights when they continued interrogating him after he invoked his right to counsel. In response, the state does not dispute that defendant was in custody, that he was being interrogated when he made the incriminating statements, or that defendant unequivocally invoked his right to counsel when he told the detectives that he wanted a lawyer. However, the state contends that the detectives did not unlawfully continue to interrogate defendant after his invocation, but rather that defendant made the incriminating statements after he initiated further discussion with the detectives and voluntarily waived his previously invoked right.
Article I, section 12, states in part, "[n]o person shall *** be compelled in any criminal prosecution to testify against himself."[2] Protection against compelled incrimination "adhere[s] when a suspect is subject to custodial interrogation." State v. Scott , 343 Or. 195, 201, 166 P.3d 528 (2007). "Consequently, under Article I, section 12, the police must give a defendant who is subject to custodial interrogation Miranda -like warnings prior to interrogation." State v. Schmidtke , 290 Or. App. 880, 884, 417 P.3d 563 (2018).
*70 Moreover, "once a suspect has invoked the rights to remain silent and to counsel under Article I, section 12, police must immediately cease interrogation unless the suspect initiates further conversation with the police." State v. Boyd , 360 Or. 302, 318, 380 P.3d 941 (2016). Simply, when a suspect asks for a lawyer, the police must stop interrogating that suspect. So, if the police continue to question a suspect, who has unequivocally invoked his rights, in a manner that is "likely to elicit some type of incriminating response," the police have unlawfully continued to interrogate that suspect. Schmidtke , 290 Or. App. at 885, 417 P.3d 563 (relying on Scott , 343 Or. at 203, 166 P.3d 528 ("we consider both the substance of the questions posed to defendant and the manner in which *708 those questions were asked") ). Put another way, statements constituting unlawful continued interrogation are those "appeared designed to confront defendant and prompt a substantive response." State v. Schrepfer , 288 Or. App. 429, 439, 406 P.3d 1098 (2017).
However, there are some questions the police may ask following a suspect's invocation that do not amount to continued interrogation and that are permitted under the circumstances. "The notion that all forms of direct questioning constitute 'interrogation' for constitutional purposes is unrealistic[,]" because certain kinds of questions can be "innocuous and do not implicate the constitutional concerns that form the underpinnings of Article I, section 12, and Fifth Amendment rights." Boyd , 360 Or. at 317, 380 P.3d 941. "Under Article I, section 12, an interrogation does not include questions 'normally attendant to arrest and custody.' " Schmidtke , 290 Or. App. at 885, 417 P.3d 563 (quoting State v. Cunningham , 179 Or. App. 498, 501-03, 40 P.3d 535, rev. den. , 334 Or. 327, 52 P.3d 435 (2002) ).[3]
This court, in Cunningham , adopted the "attendant to arrest" exception, relying upon South Dakota v. Neville , 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)[4] and Pennsylvania v. Muniz , 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990)[5] . See Cunningham , 179 Or. App. at 501-05, 40 P.3d 535 *709 (officer asked suspect whether he had anything sharp that would hurt the officer during a patdown search). As we determined in Cunningham , "Because [the officer's] question served a noncriminal, noninvestigatory purpose, it fell squarely within the class of questions that are normally attendant to arrest and custody, at least so long as it was not 'designed to elicit an incriminatory response.' " 179 Or. App. at 505, 40 P.3d 535 (quoting Muniz , 496 U.S. at 602 n 14, 110 S.Ct. 2638 ). However, we also reiterated that "the exception for questions normally attendant to arrest and custody may include questions that are reasonably likely to elicit an incriminating response, [but Muniz ] was careful to explain that the exception did not give officers carte blanche ." Id. at 503-04, 40 P.3d 535 (relying on Muniz , 496 U.S. at 602 n 14, 110 S.Ct. 2638 ("Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during *71 booking, that are designed to elicit incriminatory admissions.") ).
For example, the officer requirement to "inform the person to be arrested of the officer's authority and reason for the arrest" during the arrest or "as soon as practicable," under ORS 133.235(3), falls under the attendant to arrest exception. As this court explained, an "officer's statement merely informing defendant of the criminal activity for which the officer was investigating and detaining defendant was not designed to elicit an incriminatory response or a statement that, by its very nature, evidenced an investigatory purpose." Schmidtke , 290 Or. App. at 886, 417 P.3d 563. Similarly, as the Scott court reasoned, "In some circumstances, a constitutional violation may not result from a police officer's attempt to determine whether a suspect who unequivocally has requested counsel prefers a particular attorney. Police officers may pose such questions in a manner that is not reasonably likely to elicit an incriminating response." 343 Or. at 204, 166 P.3d 528 ("However, that hypothetical scenario is not presented [in Scott because] questions regarding defendant's preference for a particular attorney were interspersed with, and successive to, [the] questions regarding defendant's exposure to the television broadcast identifying him as a murder suspect.").
The federal courts have also weighed in on this exception. As the Ninth Circuit recently explained, when a *710 detective asked the defendant, after the defendant invoked his right to counsel, if he already had an attorney, it did not amount to unlawful continued interrogation:
"Immediately after [the defendant] requested an attorney, [a detective] asked the defendant questions about whether he already had a lawyer. Although these are express [interrogation] questions, it is reasonable to conclude that the questions were 'attendant to arrest' and that a reasonable officer would not have known that this line of questioning was 'likely to elicit an incriminating response.' "
Martinez v. Cate , 903 F.3d 982, 993-94 (9th Cir. 2018) (quoting Rhode Island v. Innis , 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ). But, as the Martinez court grappled with, some detective questioning is neither clearly attendant to arrest nor clearly unlawful continued interrogation:
"The functional equivalent of interrogation is defined as 'any words or actions on the part of the police *** that the police should know are reasonably likely to elicit an incriminating response from the suspect.' This definition 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police,' but is an objective standard such that the police 'cannot be held accountable for the unforeseeable results of their words or actions.' "
903 F.3d at 994 (quoting Innis , 446 U.S. at 301, 100 S.Ct. 1682 ) (internal citations omitted).
This type of situation blurs the line between the requirement set out in Miranda v. Arizona , 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) -"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present"-and the attendant to arrest exception that allows the police to ask an accused questions related to booking and custody, even though he has invoked his rights against compelled incrimination, Innis , 446 U.S. at 301, 100 S.Ct. 1682. As the Supreme Court explained in Innis , "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis , 446 U.S. at 301, 100 S.Ct. 1682 (footnotes omitted).
*711 Thus, the attendant to arrest exception, which exempts some questions an officer might ask the accused even after the accused has invoked his right to counsel, rests upon a determination regarding the officer's question and questioning. In application, this means that "the court must still consider how a suspect would perceive the statements" and, additionally, "how a suspect reacts to a statement can provide evidence of how the suspect perceived the statement." Martinez , 903 F.3d at 995. Yet, ultimately, a *72 court that is considering whether to admit a defendant's post-invocation statements under this exception must consider whether the officer's question was designed to elicit an incriminating response such that the post-invocation discussion served a criminal, investigatory purpose. See Cunningham , 179 Or. App. at 505, 40 P.3d 535 ; See also Muniz , 496 U.S. at 601-02, 110 S.Ct. 2638 ; Innis , 446 U.S. at 301, 100 S.Ct. 1682.
Although the attendant to arrest exception carves out a specific allowance for the police to continue to converse with a suspect who has invoked his rights, all interrogation, as that term is understood in Innis , outside of the narrow attendant to arrest exception is unlawful. Only a suspect has the power to waive Miranda protections in the custodial interrogation environment once that suspect has invoked those rights. "To demonstrate that a suspect has waived a prior invocation of the right to counsel, the state must show not only that the suspect initiated [further conversation] with the police in a way that 'evinced a willingness and a desire for a generalized discussion about the investigation' but also that the suspect's waiver was knowing and voluntary under the totality of the circumstances." State v. Fink , 285 Or. App. 302, 312, 395 P.3d 934 (2017) (quoting State v. Meade , 327 Or. 335, 341, 963 P.2d 656 (1998) ("[W]e hold that defendant, without prompting from the police, initiated further conversation that evinced a willingness and a desire for a generalized discussion about the investigation. Defendant's physical gestures cut off further questions by the officers. Having asserted control over the conversation, he then chose to reopen the topic of the investigation.") ). For example, in State v. Holcomb , the court determined that the defendant initiated further conversation because his "voluntary statements to the officers about the consequences that he possibly faced for his actions, his question about *712 the [victim's family], and his statement that [the victim] attacked him all evidence[d] defendant's willingness and desire for a generalized discussion of the substance of the investigation." 213 Or. App. 168, 178, 159 P.3d 1271, rev. den. , 343 Or. 224, 168 P.3d 1155 (2007).
If the court finds that a defendant initiated further discussion with the police that evinced a willingness and a desire for a generalized discussion about the investigation, the court must also determine whether the defendant's waiver was voluntary, knowing, and intelligent and, thus, valid. That test, under both the state and federal constitutions, "is whether, under the totality of the circumstances, it is apparent that the 'defendant's will was not overborne and his capacity for self-determination was not critically impaired.' " State v. Acremant , 338 Or. 302, 324, 108 P.3d 1139 (2005) (quoting State v. Vu , 307 Or. 419, 425, 770 P.2d 577 (1989) ).
In keeping with the law set out above, we turn to the case before us. Here, the trial court found, and the record supports those findings, that "defendant was advised of his Miranda rights before questioning" and that "he understood and agreed to talk with detectives." Likewise, as we stated previously, the state does not dispute that defendant was in custody, that he was being interrogated by the detectives when he made the incriminating statements, and that he had unequivocally invoked his right to counsel-telling the detectives that he wanted a lawyer-after he was read his Miranda warnings. The state's concession is well taken. Thus, the issue in this case is not whether defendant was under interrogation, because the parties agree he was, but rather whether defendant's incriminating statements that followed his invocation were the product of unlawful continued interrogation by the detectives in violation of Article I, section 12.
In light of that particular issue, once defendant unequivocally invoked his right to counsel, Miller acknowledged his invocation and said, "Okay" and "That's very respectful." Defendant nodded and Miller said, "Do you have a lawyer yet at all?" Defendant responded, "Not one I've retained. I don't keep a retainer." Although Miller asked *713 defendant whether he already had a lawyer after defendant unequivocally invoked his right to counsel, Miller's question, in substance and manner, did not appear to be designed to elicit an incriminating response from defendant and was not a statement that, by its very nature, evidenced an investigatory *73 purpose. Rather, under these circumstances, Miller's question was most like a question normally attendant to arrest and booking-appearing to clarify if defendant had a specific lawyer that the detectives should contact on his behalf-and "[did] not implicate the constitutional concerns that form the underpinnings of Article I, section 12, and Fifth Amendment rights." Boyd , 360 Or. at 317, 380 P.3d 941. Miller's question about the attorney is in keeping with Scott , which recognized and approved of "a police officer's attempt to determine whether a suspect who unequivocally has requested counsel prefers a particular attorney. Police officers may pose such questions in a manner that is not reasonably likely to elicit an incriminating response." Scott , 343 Or. at 204, 166 P.3d 528 ; see also Martinez , 903 F.3d at 993-94.
After asking defendant a question about the attorney, Miller said, "Okay. So the next step is we are going to charge you with murder." Miller informed defendant of his charges, that he would be extradited back to Oregon, that because defendant had asked for an attorney the detectives would be ending the interview and would not be able to accommodate defendant's request to talk off video, and that Miller would draw up the paperwork for extradition that day. Miller's conduct during the interview at this point adheres not only to what we have held as permissible, see Schmidtke , 290 Or. App. at 886, 417 P.3d 563, but what is mandated by ORS 133.235(3). In fact, in clarifying that the detectives would be terminating the interview because defendant had requested counsel, the detectives reinforced, rather than undermined, defendant's knowledge that he had the power to control the interrogation through the invocation of his constitutional rights.
Defendant also asked the detectives how soon he would be extradited, whether his case would go federal, how much time he would serve if he was found guilty, and then he asked the detectives to describe what aggravated murder was. However, rather than continuing to engage with *714 defendant, Smith interrupted and said, "We can't really discuss much more with you after you've asked for an attorney. We just need to kind of stop the interview." He continued by explaining to defendant that the detectives were not allowed to sit and chit chat with him after he had asked for an attorney. Here, again, Smith and Miller informed defendant that they were acknowledging, and respecting, his invocation of counsel.
Up until that point, defendant and the detectives had engaged in a series of questions and answers that are reasonably characterized as attendant to arrest. Although those discussions followed defendant's unequivocal invocation, the detectives' statements do not rise to the level of unlawful continued interrogation, because the nature of the detectives' responses was not primarily focused on interrogation or investigation. Moreover, it is clear on this record that the detectives repeatedly reminded defendant that he had asked for a lawyer and that any further conversations must stop.
Finally, we consider the end of the conversation involving defendant's question concerning his girlfriend's knowledge of his situation. This presents a closer question. When the detectives responded that "she will know" and that her involvement would depend on "how involved she is," those statements, viewed from the "perceptions of [defendant]" could be seen as trying to elicit an incriminating response. See Martinez , 903 F.3d at 994. However, Martinez cautions that although "[t]his definition 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police,' [it] is an objective standard." Id . Here, even if defendant could have seen the detectives' response as an effort to elicit further information from him, that perception was immediately corrected by the detectives themselves when they said, "We have to stop there."
After Smith said they needed to stop, defendant stated he wanted to "unask for a lawyer" and that he would talk to the detectives if they agreed to leave his girlfriend out of the investigation. Smith told defendant "no" and "we can't," explained to him that the detectives could not make any deals, and said, "You have asked for an attorney. If you want us to sit in here and talk to you more about this case *715 or anything else, we need *74 to be very clear that you no longer want an attorney and you want to talk to us." As the trial court concluded, and we agree, no questions related to the murder were asked of defendant after he asked for counsel; "[i]n fact, the detectives were on their way out the door when defendant brought up the issue of extradition [and] defendant then asked further questions which eventually [led] to his change of mind about wanting a lawyer."[6]
Over the span of four minutes, the detectives reminded defendant multiple times that he had asked for an attorney or that the detectives needed to stop talking with him. At no point did it appear, nor did the trial court find, that the detectives made any promises or coerced defendant in any way. Quite the opposite, after Smith's fourth attempt to explain that the detectives were not allowed to continue to talk to defendant because he had asked for an attorney, defendant looked directly into the video recorder camera and said, "Right. I do not want an attorney any longer. I am willing to talk to you guys." Smith replied, "that's fine" but "I also need to be clear that if you want an attorney at any point from this on." Defendant interrupted with, "I got to say it," but Smith continued, "you can tell us that [and] we will stop questioning you." Smith repeated, "If you don't want an attorney, we'll move forward?" As the trial court concluded, and we agree, "defendant made a voluntary decision to reinitiate the interview with detectives and this decision was made without any promises from detectives."
On this record, defendant's interaction with the detectives and his initiation of further discussion regarding the case were not the product of unlawful continued interrogation, promises, or inducement. Instead, this was the kind of further initiation that manifested a clear intent by defendant to walk back his prior invocation in order to further discuss the details of his case. Defendant's unprompted, uninstructed decision to look directly into the video recorder camera and make his intention to waive his right to counsel *716 clear, taken together with his questions that further initiated the discussion of his case with the detectives despite the detectives' multiple reminders he had invoked his constitutional right, satisfy the requirements of waiver. Furthermore, the detectives here reminded defendant multiple times over the span of four minutes that he had asked for an attorney and that invoking that right means the conversation must stop.
In this case, Smith and Miller adhered to the constitutional requirements concerning how to handle a suspect's invocation of the right to counsel in a custodial interrogation setting through a series of actions: (1) their refusal to turn off the recording device in light of an invocation; (2) their acknowledgement of defendant's invocation immediately upon being made; (3) their attempt to promptly terminate the encounter; (4) their explanation to defendant that his invocation required them to terminate the encounter; (5) their clear and explicit explanation to defendant that he would need to be "very clear" that he no longer desired an attorney if he wanted to continue the interview; and (6) their reminder to defendant that even if he "unasked" for an attorney, he continued to have the power to later invoke his right to counsel once more. Under those circumstances, defendant's incriminating statements following his invocation of the right to counsel were not the product of unlawful continued interrogation by the detectives. As such, there was no violation of Article I, section 12, and the trial court did not err in denying defendant's motion to suppress.
Affirmed.

Although defendant argued before the trial court that his waiver of counsel was not knowing, intelligent, or voluntary under the circumstances, defendant does not renew that argument on appeal. Consequently, the issue that concerns this appeal is whether defendant was unlawfully interrogated in violation of his right to counsel.

Defendant raises both state and federal constitutional claims. "Article I, section 12, of the Oregon Constitution is phrased nearly identically to the Fifth Amendment" and, as such, "this court has found case law applying the Fifth Amendment guarantee to be useful in construing the similarly worded guarantee of Article I, section 12." State v. Boyd , 360 Or. 302, 313, 380 P.3d 941 (2016). Importantly, "[t]he heart of both state and federal constitutional guarantees, after all, is protecting against compelled incrimination ." Id. at 317, 380 P.3d 941 (emphasis in original).

Although there are areas where interpretation of Article I, section 12, diverges from the Supreme Court's interpretation of the Fifth Amendment, in this particular area the Article I, section 12, jurisprudence is aligned with the federal constitution. In Boyd , the Oregon Supreme Court adopted the test from Rhode Island v. Innis , 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), to determine what constitutes "interrogation" by police. Boyd , 360 Or. at 316-17, 380 P.3d 941.

Following the Innis Court's "attendant to arrest" exception, Neville further clarified that, when the police ask a suspect to take a blood alcohol test, that inquiry does not constitute interrogation within the meaning of Miranda . Neville , 459 U.S. at 564 n 15, 103 S.Ct. 916 ("The police inquiry here is highly regulated by state law, and is presented in virtually the same words to all suspects. It is similar to a police request to submit to fingerprinting or photography. Respondent's choice of refusal thus enjoys no prophylactic Miranda protection outside the basic Fifth Amendment protection.").

The Court revisited the attendant to arrest exception again a few years later when it determined that an officer's questions regarding a suspect's name, address, height, weight, eye color, date of birth, and current age were "admissible because the questions fall within a routine booking question exception which exempts from Miranda 's coverage questions to secure the biographical data necessary to complete booking or pretrial services." Muniz , 496 U.S. at 601, 110 S.Ct. 2638 (internal quotation marks omitted).

We reiterate that the sole issue on appeal is whether defendant was subjected to unlawful continued interrogation by the detectives after he unequivocally invoked his right to counsel, not whether defendant's ultimate confession was rendered involuntary through promises of leniency.