******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DEYKEVIOUS RUSSAW
(AC 43748)

Elgo, Suarez and Palmer, Js.

*Syllabus*

Convicted of the crime of conspiracy to commit murder as a result of a
drive-by shooting during which an unintended person rather than the
intended victim was fatally shot, the defendant appealed. He claimed,
inter alia, that his conviction was legally insufficient because the state
relied on the doctrine of transferred intent to prove the conspiracy
charge and because it is legally impossible to conspire to kill an unin-
tended victim. The state, which also charged the defendant with murder,
alleged that the defendant had intended to kill a member of a rival gang
but, instead, fatally shot the unintended victim, and the trial court, in
its instructions to the jury, stated that the doctrine of transferred intent
applied to both the murder charge and the charge of conspiracy to
commit murder. *Held*:

1. The defendant could not prevail on his unpreserved claim that his convic-
tion of conspiracy to commit murder is legally insufficient, which was
based on his assertion that the doctrine of transferred intent does not
apply to the crime of conspiracy, and, thus, he was deprived of his right
to due process because it is legally impossible to conspire to kill an
unintended victim: the state did not rely on the doctrine of transferred
intent, as that theory bore no relevance to the conspiracy charge because
it made no difference whether the rival gang member or the unintended
third party was killed, and the state alleged and proved the elements
of the conspiracy charge, which were the agreement to kill the rival
gang member and the overt act of firing the gunshot intended for the gang
member in furtherance of that agreement; moreover, the trial court's
jury instruction on transferred intent did not transform the state's theory
of the conspiracy charge into one predicated on that doctrine, that
instruction having been, at most, surplusage that had no bearing on the
nature of the state's case or the jury's consideration of whether the
state proved its case.

2. The defendant's claim that the trial court improperly denied his motion
to suppress certain incriminating statements he had made to the police
during their custodial interrogation of him was unavailing, as the record
supported the court's findings that the police ceased questioning him
after he invoked his right to counsel but that he thereafter initiated
further communication with them of his own accord without counsel
present:

a. Contrary to the defendant's assertion that the police induced him to
speak to them after he invoked his right to counsel, the trial court
correctly concluded that he knowingly and voluntarily initiated further
communication, as it credited testimony by R, the lead detective during
the questioning, that another officer had informed R that the defendant,
notwithstanding the previous invocation of his right to counsel, wanted
to speak with the police: the defendant was advised of his rights under
*Miranda* v. *Arizona* (384 U.S. 436) before questioning resumed, he pro-
vided no authority to support his claim that the police were required to
provide him with an attorney or means to contact one, he did not ask
them for permission to contact anyone, and his father was at the police
station during the custodial interview and had visited with him; moreover,
the record did not bear out the defendant's contention of persistent
statements by the police that they wanted to talk to him, and the brief
outline of the incriminating evidence they gave him was in response to
his question about why he was being held on a charge of murder.

b. This court concluded, in light of all of the relevant facts adduced at the
suppression hearing, that the state had met its burden of demonstrating
a knowing, intelligent and voluntary waiver by the defendant of his
*Miranda* rights, as there was no showing that the police threatened the
defendant or employed other coercive or improper tactics to obtain the
waiver: although the defendant became eighteen years of age the day
before the police questioned him, that did not require the court to reach

a different conclusion, as the defendant had an eleventh grade education, could read and write, was not impaired in any way, and had signed two waiver forms after twice being informed of his *Miranda* rights, and his assertion of his right to counsel after being advised of those rights the first time was a clear indication that he understood those rights; moreover, the defendant's will was not overborne, as he contended, because the police did not contact a lawyer for him and, for a period of time, left him alone in the interview room separated from his father, and the surroundings and circumstances of his police interview, although hardly comfortable, did not mean that he was necessarily unable to decide whether to resume speaking to the police without a lawyer.

c. The defendant could not prevail on his claim that he was harmed by the admission of R's testimony as to certain statements the defendant made during his police interview: because there was compelling independent evidence that the defendant was a passenger in the vehicle from which the gunshot was fired at the time it was fired, his statement to R acknowledging that he was in the vehicle was merely cumulative, and his statement to R identifying the intended victim of the shooting did not establish that the defendant was present when the shooting took place, as that statement contained no indication as to how the defendant became aware of the identity of the intended victim, it was hardly persuasive evidence of his participation in the shooting, and it could have been based on information he learned after the shooting; moreover, the state was not required to establish the shooter's identity for purposes of the charge of conspiracy to commit murder, the evidence having been clear that, even if the defendant did not fire the gunshot, it was fired from the vehicle in which he was a passenger, and the testimony of another passenger who claimed that the defendant was not in the vehicle at the time of the shooting was flatly contradicted by that passenger's sworn statement to the police; furthermore, all of the witnesses who testified were subjected to extensive cross-examination about whatever interest or motive they may have had to falsely implicate the defendant, and the jury was well aware of any such interest or motive.

Argued September 20, 2021—officially released June 21, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and conspiracy to commit murder, brought to the Superior Court in the judicial district of Hartford, where the court, *D'Addabbo, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *D'Addabbo, J.*; verdict and judgment of guilty of conspiracy to commit murder, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *David L. Zagaja*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Deykevious Russaw, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48.[1] The defendant's conviction stems from an incident involving a drive-by shooting that resulted in the death of an unintended third person rather than the intended victim. On appeal, he claims, first, that his conviction of conspiracy to commit murder is legally insufficient because the doctrine of transferred intent, upon which he contends the state relied, does not apply to the crime of conspiracy, and second, that the trial court improperly denied his motion to suppress certain statements that he made to the police while he was in custody and after he had invoked his right to counsel. We reject both of the defendant's claims and, therefore, affirm the judgment of conviction.

The following facts and procedural history are relevant to this appeal. The defendant's conviction stems from a drive-by shooting that occurred on July 16, 2017, and resulted in the death of the victim, Jeffrey Worrell, who had sustained a single gunshot wound to the head. When he was shot, the victim was sitting at a picnic bench in a small park located in an area in Hartford known as the five corners, where Westland Street, Garden Street and Love Lane all intersect. Police officers who arrived at the scene shortly after the shooting spoke to witnesses, but none gave a description of the shooter. Shell casings, however, were recovered from the scene, and a video surveillance camera installed by the city of Hartford at the corner of Garden and Westland Streets captured the shooting. Upon review of the footage from that camera, the police identified three vehicles involved in the incident, a blue Honda Accord, a black Ford Escape, and a white Nissan Altima. The driver of the Honda Accord was identified as Dominick Pipkin, who, upon questioning by the police within hours of the shooting, provided information concerning the identities of the individuals in both the Nissan Altima and the Ford Escape. With respect to the occupants of the Ford Escape, Pipkin identified the driver as Teddy Simpson, and the rear passengers as Jonathan Vellon and his brother, Osvaldo Vellon, and a person whose nickname is "Bama," later identified as the defendant.[2] The police also received information identifying the front seat passenger of the Ford Escape as Dayquan Shaw.[3] In addition, the Vellon brothers, who admitted that they were present when the shooting occurred, gave the police information about others involved in the incident, including the defendant. Early in the investigation, it became apparent to the police that a member of a rival gang, and not the victim, was the likely target of the shooting.

Shortly after the incident, the police identified several

addresses associated with the defendant, including a former residence in a multiunit apartment building in New Britain. When detectives from the Hartford Police Department went to that former residence in New Britain the day after the shooting, they discovered the Ford Escape.

On the basis of the foregoing information, the lead investigator in the case, Sergeant Anthony Rykowski of the Hartford Police Department, prepared and obtained arrest warrants for Simpson and the defendant. The defendant was charged with murder and conspiracy to commit murder and arrested three days after the incident, on July 19, 2017. Following the defendant's arrest and transportation to police headquarters, Rykowski questioned the defendant, who made several incriminating statements.

A jury trial followed,[4] at which the state adduced testimony from several witnesses to the incident, including Jonathan Vellon. In his testimony, Jonathan Vellon acknowledged that he had provided the police with a written statement about the incident the next day, but he refused to identify anyone else who was in the car when the shooting occurred. He also testified that he did not know who was driving the Ford Escape at the time of the shooting, from where in the car the gunshots were fired, or who brought the gun into the car, even though his statement to the police indicated otherwise. When asked why he was refusing to provide the names of the individuals in the car, he stated that he "just [did not] feel like it." Although he did testify that he knew the defendant, he denied that the defendant was in the Ford Escape on the day of the shooting, and he also denied providing any contrary information to the police. Moreover, he claimed that he did not sign the statement even though he previously had acknowledged that the signature on the statement was his.

At the conclusion of Jonathan Vellon's testimony, the state introduced into evidence his written statement to the police pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[5] That statement provides in relevant part: "On Sunday afternoon [on the day of the shooting], my brother Osvaldo [Vellon] and I . . . were walking past . . . Flatbush Avenue . . . [when] I heard someone call my name from inside a car. When I looked at the car, I noticed [the defendant] in a black Ford Escape. [The defendant] was sitting in the passenger side rear seat . . . [and] told us to get in the car [and] so we did. . . . The person driving the Ford Escape is named Teddy [Simpson]. . . . The front seat passenger was someone I've never seen before . . . .

"Once inside the car, all five of us drove around and were smoking weed. . . . [Simpson] then pulled up to a blue Honda Accord and I saw a black male, around [nineteen to twenty years old] driving the Honda all

alone. . . . I heard [Simpson] and [the defendant] say let's shoot the G's. The G's are gang members from the Barbour Street area. I've been with the Ave gang for around three months . . . . The Ave gang is from the Albany Avenue area.

"The next thing I [knew] [Simpson] was handed a gun by the driver of the blue Honda Accord and then [Simpson] passed it to [the defendant]. The gun was a small black handgun and it looked like the handle was grayish because it looked old. I heard the driver of the Honda tell [the defendant] that he wanted him to shoot the G's. [Simpson] then drove down the street and [the defendant] racked the gun back and I saw a bullet fall inside the car. [The defendant] then held the gun out the window and shot the gun around three times. I think the gun jammed once or twice as [the defendant] was shooting. [Simpson] then sped away and drove to meet the guy in the blue Honda Accord. . . . [The defendant] then passed the gun over to [Simpson] who then handed the gun out the window to the driver of the blue Honda Accord. [Simpson] then told [the defendant] to drive so [Simpson] got into the passenger seat, [the defendant] got into the driver's seat and the tall guy who was sitting in the passenger seat before walked home. We sat there for around [twenty] minutes and then [the defendant] drove the Ford Escape to New Britain and parked it where the [p]olice found it . . . . [The defendant] used to live at the apartment where the car was found . . . . Once [the defendant] parked the car, [my brother] and I walked home to our house . . . ." (Internal quotation marks omitted.) In his written statement, Jonathan Vellon further stated that he had identified the defendant from a photographic array shown to him by the police, that he signed his name on the defendant's photograph, and that he was "100 [percent] sure" the photograph chosen from the array was the defendant, whom he "saw shoot from the Ford Escape at the G's," as he "was sitting shoulder to shoulder with [the defendant]" at the time of the shooting.[6] (Internal quotation marks omitted.)

The state next adduced testimony from Simpson, who testified pursuant to a plea agreement with the state related to his involvement in the shooting of the victim.[7] Simpson explained that he was associated with the Ave gang and was involved in the shooting as the driver of the Ford Escape. He further testified that the other occupants of the car were Jonathan Vellon, Osvaldo Vellon, the defendant and Shaw. According to Simpson, at some point when they were driving around near the intersection of Garden and Capen Streets, they stopped to talk with Pipkin, who was operating a blue Honda. Simpson stated that he was familiar with a picnic spot in the area known as the five corners, and that, while driving in that area, they saw a group of kids from the G's neighborhood with whom they did not get along. Subsequently, they met up again with Pipkin, who began

waving a handgun, and Simpson asked Pipkin for the gun at the defendant's request because the defendant had expressed a desire to open fire on the G's. At first, Pipkin told Simpson just to drive off but, shortly thereafter, Pipkin handed the gun to Shaw, who gave it to the defendant. Simpson testified that he did not see the defendant with the gun in the backseat and did not see the defendant fire the gun because he was focused on driving. He also testified that the defendant was not a member of the Ave gang.

Shaw also testified for the state. He stated that he was a front seat passenger in the Ford Escape at the time of the shooting, and he described the other passengers as two Hispanic males and the defendant. He testified further that, as they were driving around the five corners area, they saw a group of people in the grassy area, at which point the defendant stated that they were from the G's gang and that he did not like them. Shaw's testimony was consistent with that of Simpson with respect to how they had encountered Pipkin, the fact that the defendant possessed a gun in the Ford Escape, and how the shooting took place. Shaw also testified that, as they were driving away from the scene of the shooting, the defendant was "bragging about the incident" and saying, "I got somebody." Shaw further stated that the defendant had texted him on the night of the incident and "showed no remorse even though he killed an innocent bystander, he didn't feel bad about it. It was like he was joyful of it, like he didn't care it was an old man."[8]

Finally, Rykowski testified about certain statements that he had obtained from Pipkin, Osvaldo Vellon and the defendant. With respect to Pipkin and Osvaldo Vellon, Rykowski explained that both of them had provided statements to the police shortly after the incident identifying the defendant as a passenger in the Ford Escape.

Rykowski further testified that he interviewed the defendant following his arrest on July 19, 2017. Although the defendant denied any involvement in the shooting, he did acknowledge that he had been in the Ford Escape on the day of the shooting. He also told Rykowski that he did not get along with the "G's."

Following the conclusion of the evidence,[9] the jury returned a verdict of not guilty on the murder charge and guilty on the charge of conspiracy to commit murder. The court sentenced the defendant to a term of twenty years of incarceration, which was to run consecutively to a sixteen year sentence he was already serving.[10] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant claims, for the first time on appeal, that his conviction of conspiracy to commit murder is legally insufficient because the doctrine of transferred

intent does not apply to the crime of conspiracy. Specifically, he maintains that, because the state's theory of the case was that the intended target of the murder was a member of the rival gang and not the victim, and because it is legally impossible to conspire to kill an unintended victim, his conspiracy conviction cannot stand. He seeks review of his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[11] Although we agree with the defendant that he is entitled to review of his claim under *Golding*, we reject the claim because his conspiracy conviction was not predicated on the doctrine of transferred intent.

The following additional facts are relevant to this claim. The defendant was charged in a two count information with murder in violation of § 53a-54a and conspiracy to commit murder in violation of §§ 53a-54a and 53a-48. The murder charge, set forth in count one, alleged that, "on or about July 16, 2017, at approximately 2 p.m. in the area of Garden and Westland Streets in Hartford . . . the defendant, while acting with the intent to cause the death of another person, caused the death of a third person by discharging a firearm." Count two, which contained the charge of conspiracy to commit murder, alleged that, "on or about July 16, 2017, at approximately 2 p.m. in the area of Garden and Westland Streets in Hartford . . . the defendant, while acting with the intent that conduct constituting the crime of murder be performed . . . agreed with one or more persons to engage in and cause the performance of such conduct and any one of them committed an overt act in furtherance of said conspiracy."

At trial, the state's theory with respect to the murder charge was that the defendant fired the handgun from inside the vehicle with the intent to kill a member of the rival gang but, instead, missed and killed the victim. As noted previously in this opinion, the jury found the defendant not guilty of that charge. With respect to the conspiracy to commit murder charge, the jury found the defendant guilty of conspiring with at least one other person in the Ford Escape to shoot and kill a member of the rival gang. On appeal, the defendant does not challenge the legal or evidentiary sufficiency of the state's case with respect to his conviction of conspiracy to commit murder insofar as the state was required to prove both that he had entered into an agreement with at least one other person to murder a member of the rival gang and that one of the conspirators committed an overt act in furtherance of the conspiracy. He claims, rather, that the state's case was founded on the doctrine of transferred intent, which, although concededly applicable to the crime of murder, does not apply to conspiracy. Consistent with this assertion, the defendant maintains that he could not have conspired to kill an unintended victim and that, because

the victim of the shooting was unintended, his conviction of conspiracy to commit murder is unlawful. This claim is unavailing because it rests on a false premise, namely, that the defendant's conspiracy conviction was predicated on a theory of transferred intent.[12]

The defendant's claim that his conspiracy conviction was impermissibly founded on the doctrine of transferred intent is largely based on the trial court's jury charge. We therefore recite the relevant portions of those instructions, commencing with the court's charge on transferred intent. The court explained transferred intent as follows: "[I]n considering the evidence presented and what you find credible, it may establish that the defendant had the intent to cause the death of one person and by his actions caused the death of a different person. Our law is that, when considering intent, as long as the defendant has the intent to cause the death of a person and, by his actions, cause[s] the death of another, that is sufficient to establish the element of intent."[13]

Thereafter, the court instructed the jury on the murder charge in count one as follows: "[F]or you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. One, that the defendant had the specific intent to cause the death of another person. And, two, that, acting with that intent, the defendant caused the death of a third person . . . by discharge of a firearm. . . .

"The first element, intent. The first element the [state] must prove beyond a reasonable doubt [is] that the defendant had the specific intent to cause the death of another person. The state must prove beyond a reasonable doubt the defendant, in causing the death of the other person, did so with the specific intent to cause the death of a person; in other words, that the defendant's conscious objective was to cause the death of a person. . . .

"Intent, therefore, is intent to achieve a specific result; in other words, a person's conscious objective was to cause the specific result. As defined by law, a person acts intentionally with respect to the result when his conscious objective is to cause such result. *Now, the court has previously instructed you on intent and transferred intent. Those instructions apply in this section as well.*" (Emphasis added.)

At the conclusion of its jury instructions on murder, the court proceeded to instruct the jury on the second count, conspiracy to commit murder. After reading the allegations contained in count two, the court recited the elements of the conspiracy statute, § 53a-48 (a).[14] The court then instructed the jury as follows: "So, for you to find the defendant guilty of conspiracy in this count, conspiracy to commit murder, the state must prove the following elements beyond a reasonable

doubt: one, that the defendant intended to commit the crime of murder; two, an agreement with one or more persons to engage in or cause the performance of the crime of murder; and, three, the commission of an overt act pursuant to the agreement by one or more of the persons who made the agreement. . . .

"The first element is that [the] defendant had the intent that conduct constituting the crime of murder be performed. The defendant must be proven to have been actuated by criminal intent. The defendant may not be found guilty unless the state has proven beyond a reasonable doubt he had a specific intent to violate the law and, in this case, intent to commit murder when he entered into an agreement to engage in conduct constituting a crime. *You will refer to the court's previous instructions on intent and transferred intent that are incorporated here with the same force and effect.* For the count of conspiracy, it is only necessary that he intended that certain conduct, which, if performed, would constitute the crime of murder, be performed or take place." (Emphasis added.)

In explaining the second element—the agreement— the court again made reference to intent. Specifically, the court stated in relevant part: "Remember that I instructed you that intent relates to the condition of the mind of the person who commits the act, his purpose in doing it. . . . *That instruction included an instruction on transferred intent, and that instruction is incorporated in this section with the same force and effect.*" (Emphasis added.)

Relying primarily on the court's instruction that its advisement to the jury concerning the meaning of transferred intent applied to the charge of conspiracy to commit murder as well as to the murder charge, the defendant asserts that, in light of that instruction, his conspiracy conviction was predicated on a theory of transferred intent. The defendant further maintains that the transferred intent doctrine is inapplicable to the crime of conspiracy and, consequently, his conspiracy conviction is fatally flawed as a matter of law.

We note, preliminarily, that, although the defendant's claim on appeal is based on the court's instructions regarding transferred intent, the defendant does *not* purport to raise a claim of instructional impropriety. Indeed, in the trial court, the defendant expressly stated that he had no objection either to the instruction on conspiracy or to the instruction on transferred intent. Moreover, any claim of instructional error that the defendant might have raised on appeal would be deemed impliedly waived under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011),[15] because the record clearly reflects that defense counsel had ample time to review the court's proposed charge and to object to the portions of the charge at issue and affirmatively accepted the proposed instructions. The defendant

claims, rather, that his conviction must be reversed because the jury found him guilty of conspiracy based on a theory that he agreed to kill an unintended victim, which, the defendant further contends, is a legal impossibility. In other words, according to the defendant, the state's evidence, viewed most favorably to the state, established conduct by the defendant that simply does not constitute the crime of conspiracy. Of course, if the defendant is correct that he was convicted of a crime that is not cognizable under our law, then his conviction would be fundamentally incompatible with the fairness principles underlying the right to due process. See, e.g., *State* v. *Toczko*, 23 Conn. App. 502, 505, 582 A.2d 769 (1990) (defendant's fundamental constitutional rights were violated by virtue of his conviction of conspiracy to commit manslaughter, which is not cognizable crime).

We agree with the defendant that his claim, though unpreserved, is reviewable under *Golding* because the record is adequate for review of the claim and it is of constitutional magnitude. The defendant's claim fails, however, because he cannot establish that his conviction of conspiracy to commit murder was legally insufficient in violation of his right to due process.

Before considering the merits of the defendant's claim, we first set forth certain general principles governing the crime of conspiracy. "To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed." (Internal quotation marks omitted.) *State* v. *Beccia*, 199 Conn. 1, 3, 505 A.2d 683 (1986). "While the state must prove an agreement [to commit murder], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [Although] [c]onspiracy can seldom be proved by direct evidence . . . [i]t may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Soyini*, 180 Conn. App. 205, 224–25, 183 A.3d 42, cert. denied, 328 Conn. 935, 183 A.3d 1174 (2018).

"Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of the offense." (Emphasis omit-

ted; internal quotation marks omitted.) *State* v. *Beccia*, supra, 199 Conn. 3–4. "The state, therefore, in order to prove the offense of conspiracy to commit murder, must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to cause the death of another person." (Internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 286–87, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007). With due regard for these principles, we now address the defendant's contention that his conviction of conspiracy to commit murder is unlawful because it was founded on the doctrine of transferred intent.

In the present case, the state did rely on a theory of transferred intent to prove the murder charge: the state sought to establish that the defendant, acting with the intent to kill a rival gang member, killed someone else. The defendant does not dispute the applicability of that theory to the crime of murder. Indeed, the murder statute, § 53a-54a, contemplates scenarios of the kind that occurred here because the statute expressly provides that a person commits the crime of murder when, with the intent to cause the death of one person, he causes the death of another person. See footnote 1 of this opinion.

The state, however, did *not* rely on the doctrine of transferred intent with respect to the conspiracy to commit murder charge. The conspiracy alleged and proven by the state was an agreement to kill a rival gang member, and the overt act proven by the state was the gunshot intended for that rival gang member. The conspiracy to commit murder charge was established by virtue of that proof and that proof alone. Although the gunshot that was fired was intended to kill the rival gang member, the fact that the gunshot, instead, killed the victim is simply irrelevant for purposes of the conspiracy to commit murder charge. In other words, with respect to *that* charge, the state did not need to prove, and indeed could not have proved, that the defendant and at least one other person agreed to kill the actual victim. Rather, as we have explained, the state merely sought to prove, and did prove, first, an agreement to kill a rival gang member, and second, the commission of an overt act in furtherance of that agreement, specifically, the gunshot that was intended for the rival gang member but which struck and killed the victim.

The defendant's claim is unavailing, then, because it fails to account for a fundamental difference between the crime of murder, which, among other things, requires proof that a person was killed, and the crime of conspiracy to commit murder, which requires proof only of an *agreement* to kill and an overt act in furtherance of that agreement. Put differently, the conspiracy charge does *not* require proof that the object of the conspiracy, namely, the death of a person, was accom-

plished, nor does it require proof regarding the result of the overt act committed. As our Supreme Court has explained: "The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, *not the accomplishment of the objective of the conspiracy. . . .* Conspiracy is an inchoate offense the essence of which is an agreement to commit an unlawful act. . . . The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Beccia*, supra, 199 Conn. 3; see also *State* v. *Fox*, 192 Conn. App. 221, 228, 217 A.3d 41 (it is agreement that "constitutes the conspiracy which the statute punishes" (internal quotation marks omitted)), cert. denied, 333 Conn. 946, 219 A.3d 375 (2019). In the present case, because the crime of conspiracy to commit murder was completed when the defendant and one or more coconspirators agreed to kill a rival gang member and a gun was fired to that end, the defendant's conspiracy conviction is legally sound even though the murder charge itself was predicated on the death of an unintended victim. Thus, although the murder charge was based on a theory of transferred intent, the charge of conspiracy to commit murder was not.

Furthermore, it is apparent that the court's instruction to the jury that the doctrine of transferred intent applied to the conspiracy to commit murder charge as well as to the murder charge did not serve to transform the state's theory of the conspiracy charge into one predicated on transferred intent. Notwithstanding the court's instruction on transferred intent, that doctrine simply bore no relevance to the conspiracy charge because the state's theory with respect to that charge, in contrast to its theory with respect to the murder charge, had nothing to do with transferred intent. For purposes of the conspiracy charge, it made no difference whether the rival gang member was killed—as had been planned—or whether, as actually occurred, the victim of the shooting was an unintended third party. As we have explained, all that was necessary for the state to establish the crime of conspiracy was proof that the defendant agreed with one or more other persons to cause the death of the rival gang member and that an overt act was committed in furtherance of that agreement, and the defendant does not challenge the adequacy or validity of the state's proof in that regard. In such circumstances, the court's instruction to the jury concerning the applicability of the doctrine of transferred intent to the conspiracy charge was, at most, mere surplusage that had no bearing on the nature of the state's case against the defendant or on the jury's consideration of whether the state had proven its case.

For these reasons, the defendant's conviction of conspiracy to commit murder was not predicated on the doctrine of transferred intent. Accordingly, the defen-

dant cannot prevail on his claim of a due process violation stemming from his conviction of an offense that is not legally cognizable in this state, and his claim, thus, fails under the third prong of *Golding*.

II

The defendant next claims that the court improperly denied his motion to suppress certain statements he made to the police during a custodial interrogation after he had invoked his constitutional right to counsel. He contends that the police impermissibly failed to honor his request for an attorney and that any statements he made thereafter were the result of improper questioning by the police in violation of his fifth amendment rights as safeguarded by *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and its progeny. He also claims, alternatively, that his statements should have been suppressed because they were the product of police coercion and, therefore, not made following a knowing and voluntary waiver of his *Miranda* rights. We disagree.

The following facts and procedural history are necessary to our resolution of the defendant's claims.[16] Three days after the shooting, the defendant was located by the police and brought to the Hartford Police Department, where he was taken to an interview room, which was equipped with a video camera, for questioning. The video recording of the interview commenced at 2:27 p.m., at which time the defendant was alone in the room. Approximately thirty minutes later, Rykowski and another detective entered the room with the defendant's father, and Rykowski proceeded to review a parental consent form with the father,[17] followed by his review of a waiver of rights form with the defendant. Both the defendant and his father signed their respective forms. Subsequently, the police and the defendant's father left the interview room, and at 3:20 p.m., Rykowski returned to the room with his partner, Detective Jeffrey Pethigal,[18] at which time they began questioning the defendant. At 3:35 p.m., Rykowski told the defendant that he was under arrest for murder and summarized the evidence that the police had against him. After that, Rykowski and Pethigal again departed the interview room until 4:26 p.m., when Pethigal returned with the defendant's father and questioned the defendant about his cell phone.

The following colloquy then transpired between the defendant and Pethigal:

"[The Defendant]: But is there like any way, cause this is a serious matter, and I feel like just so I'm ok with my like future and stuff, cause I don't know [what] the outcome of this [is] gonna be, *is there any way I could get like a lawyer in here*, so I know what's going on 'n stuff?

"[Pethigal]: What's that?

"[The Defendant]: 'Cause I don't really understand like what's going on and like and that's why I was saying I wanted my father in here.

"[Pethigal]: You can talk to your father, it's whatever you want to do.

"[The Defendant]: *Could we have a lawyer in here*, 'cause this is a serious matter.

"[Pethigal]: Yeah, you have your rights waiver, right?

"[The Defendant]: Huh?

"[Pethigal]: The rights waiver you signed.

"[The Defendant]: Um-hmm. It said I could have a lawyer.

"[Pethigal]: Exactly, you understood it.

"[The Defendant]: Could you have—*could you have a lawyer come in here*?

"[Pethigal]: Ok  .  .  .  .  If that's what you want?

"[The Defendant]: Yeah, because it don't wanna . . . I don't wanna, you get what I'm sayin? This is a serious matter.

"[Pethigal]: Alright, hold on  .  .  .  ." (Emphasis added.)

Thereafter, Pethigal ceased questioning and left the interview room, followed by the defendant's father. Several minutes later, Sergeant Rivera[19] opened the door to the room and told the defendant to "come on," to which the defendant replied, "where am I going?" Rivera explained to the defendant that he was taking him to the booking room to be processed because he was under arrest. When the defendant expressed confusion, Rivera told the defendant that he would have Pethigal and Rykowski explain the charges to him. Shortly thereafter, while Rivera and the defendant were still in the interview room, Pethigal returned and the following colloquy took place:

"[Pethigal]: Did you not understand us?

"[The Defendant]: You all said that  .  .  .  somebody said I did that. I didn't do anything.

"[Pethigal]: You are under arrest for murder.

"[The Defendant]: How [am I] under arrest for  .  .  .

"[Pethigal]: Listen, you asked for a lawyer, I can't speak to you, ok?

"[The Defendant]: What  .  .  .  did I do?

"[Pethigal]: Listen, I would love to discuss this more but you asked for a lawyer and I can't speak to you.

"[Rivera]: You have to stand up, come on.

"[The Defendant]: How am I getting arrested for murder  .  .  .  .

"[Rivera]: You requested an attorney, we cannot discuss this further with you. . . . You had your opportunity to speak to us. You requested a lawyer. We are done talking with you, sir.

"[The Defendant]: If I want to talk to you guys, can we talk about it?"

Neither Pethigal nor Rivera responded directly to the defendant's question, instead directing him to stand up and put his hands behind his back.

Thereafter, the defendant was escorted out of the interview room for booking. According to testimony by Rykowski at the hearing on the motion to suppress, when Rivera and the defendant were both in the booking room, the defendant told Rivera that he wanted to speak with Rykowski. Because there was no video camera in the booking room, the defendant's statement to Rivera was not recorded.

Upon completion of the booking process, the defendant was returned to the interview room. Rykowski returned to the room, as well, and asked the defendant to clarify whether he wanted to speak to him, to which the defendant responded, "I do, 'cause I didn't even do anything." Rykowski continued to question the defendant to make sure that he wanted to speak further to the police without an attorney present. After that exchange, the defendant's father entered the interview room, and Rykowski again explained the waiver of rights and parental consent forms to the defendant and his father, respectively. The defendant's father again signed a parental consent form, and the defendant completed and signed another waiver of rights form. Rykowski thereafter read the defendant his *Miranda* rights for a second time, and the defendant initialed a form indicating that he had been advised of his rights and understood them. Thereafter, the interrogation of the defendant recommenced, and the defendant eventually admitted to being in the Ford Escape on the day of the shooting, and he gave the police a signed, written statement to that effect. He also told Rykowski that the intended target of the shooting was Deandre Johnson, a rival gang member.

The defendant filed a motion in advance of trial seeking to suppress the statements he made to the police following his invocation of his right to counsel but after he told the police that he wanted to continue to talk with them.[20] In support of his motion, the defendant argued that the police had improperly induced him to speak despite his expressed desire to have counsel present and that the efforts by the police to do so had rendered his *Miranda* waiver involuntary. Following a hearing, the court denied the defendant's motion. Expressly finding Rykowski to be a credible witness, the court concluded that the defendant had waived his rights knowingly, intelligently and voluntarily. The

court further found that the defendant himself had "initiated the continued communication with the police" and that "[t]here [was] no evidence . . . that would indicate that the defendant's will was overborne and the decision to speak to the police was anything other than the result of his free, considered, and unconstrained choice."

Subsequently, at trial, the state adduced testimony from Rykowski that the defendant had acknowledged that he was in the Ford Escape on the day of the shooting. Rykowski further testified that he believed that the defendant also told him the name of the intended target of the shooting. On appeal, the defendant contends that the trial court incorrectly refused to suppress the statements at issue, and he renews the arguments that he made in the trial court in support of his claim. The state maintains that the court properly denied the defendant's motion to suppress his statements and, further, that any possible impropriety was harmless beyond a reasonable doubt. For the reasons that follow, we agree with the state.

Preliminarily, however, we set forth our standard of review and certain legal principles that govern our consideration of the defendant's claims. The standard of review of the trial court's denial of the defendant's motion to suppress is well settled. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen [however] a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 295–96, 25 A.3d 648 (2011).

With respect to the law applicable to the defendant's claims challenging the trial court's denial of his motion to suppress, "[t]he [f]ifth [a]mendment [to] the United States [c]onstitution provides: '[n]o person . . . shall be compelled in any criminal case to be a witness against himself' . . . . To protect this constitutional right against self-incrimination, the Supreme Court's landmark decision in *Miranda* v. *Arizona* [supra, 384 U.S. 444] established certain 'procedural safeguards' that officers must comply with to subject a suspect to custodial interrogation." (Citation omitted.) *United States* v. *Abdallah*, 911 F.3d 201, 209–10 (4th Cir. 2018).

Among them, an accused has the right to have an attorney present during custodial police interrogation; *Miranda* v. *Arizona*, supra, 444; and if the accused requests an attorney, "interrogation must cease until an attorney is present." Id., 474. "It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. [Id., 444.] Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody;[21] and (2) the defendant must have been subjected to police interrogation." (Footnote added; internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 302 Conn. 294.

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . [W]hether a defendant was subjected to interrogation . . . involves a . . . two step inquiry in which the court must determine first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that it is reasonably likely to elicit an incriminating response." (Citations omitted; internal quotation marks omitted.) Id., 295; see also *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (exempting from definition of interrogation words and actions that are "normally attendant to arrest and custody").

In *Edwards* v. *Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the United States Supreme Court amplified the safeguards that must be afforded an accused who requests counsel during custodial interrogation. Specifically, the court in *Edwards* held that, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [The court] further [held] that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (Footnote omitted.) Id., 484–85. With these principles in mind, we turn to the defendant's claims.

A

The defendant first claims that the police violated his fifth amendment right to counsel by failing to honor his invocation of his right to counsel by questioning him after he had done so. More specifically, the defendant contends that, insofar as he initiated communication with the police after his earlier request for counsel, he did so only because the police had impermissibly induced him to speak to them. He therefore argues that he is entitled to suppression of the statements he made to the police after he resumed talking to them. We are not persuaded by the defendant's claim.

As we have explained, after the defendant was brought to the police station, he was informed of his *Miranda* rights, signed a waiver of rights form, and was questioned by the police. At approximately 4:28 p.m., the defendant asked: "[I]s there any way I could get like a lawyer in here?" That question was followed by two more requests for counsel, made in close succession, in which he asked, "[c]ould we have a lawyer in here?" and "could you have a lawyer come in here?" Under the fifth amendment, although "police officers conducting a custodial interrogation have no obligation to stop and clarify an ambiguous invocation by the defendant of his right to have counsel present . . . they must cease interrogation . . . upon an objectively unambiguous, unequivocal invocation of that right." *State* v. *Purcell*, 331 Conn. 318, 320–21, 203 A.3d 542 (2019). For purposes of this appeal, there is no dispute that the defendant's statements constituted a sufficiently clear and unequivocal request for an attorney that required a halt to all questioning. Although the defendant contends that Pethigal's immediate response to the defendant's invocation of his right to counsel— Pethigal reminded the defendant that he previously had waived that right—was designed to prompt the defendant to continue speaking to the police, no actual questioning took place and the defendant made no incriminating statements until several hours later, after he had reinitiated communication with the police. The crux of the defendant's claim, therefore, is that he resumed speaking to the police only because the police themselves induced him to do so in derogation of his right to counsel.

As noted previously, under *Edwards*, once a defendant has requested counsel, the police may not question him further until counsel is present unless the accused himself initiates further communication with the police. *Edwards* v. *Arizona*, supra, 451 U.S. 484–85. In *Smith* v. *Illinois*, 469 U.S. 91, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984), the United States Supreme Court clarified the rule in *Edwards*, stating: "[The] rigid prophylactic rule [set forth in *Edwards*] . . . embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts

may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." (Citations omitted; internal quotation marks omitted.) Id., 95. The court in *Smith* further explained: "*Edwards* set forth a bright-line rule that *all* questioning must cease after an accused requests counsel. . . . In the absence of such a bright-line prohibition, the authorities through badger[ing] or overreaching—explicit or subtle, deliberate or unintentional— might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 98. Thus, "[w]hen officers fail to scrupulously honor a suspect's invocation of the right to counsel, the suspect's subsequent waiver of that right—and any confession that follows—is presumptively invalid." (Internal quotation marks omitted.) *Rodriguez* v. *McDonald*, 872 F.3d 908, 926 (9th Cir. 2017). Our Supreme Court has explained that "[t]he initiation of conversation includes inquiries that can be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 591, 916 A.2d 767 (2007). For example, in *Oregon* v. *Bradshaw*, 462 U.S. 1039, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983), the United States Supreme Court held that the defendant initiated further conversation with the police when he asked, " '[w]ell, what is going to happen to me now?' " Id., 1045; see also *State* v. *Hafford*, 252 Conn. 274, 294, 746 A.2d 150 (defendant's question concerning what would happen to him next constituted initiation under *Edwards*), cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

Because the inquiry required by the defendant's claim is necessarily fact specific, we set forth the facts and circumstances relevant to our resolution of the claim. The video recording of the defendant's interview with the police reveals that he invoked his right to have counsel present at 4:28 p.m. and that, following a brief exchange with Pethigal, all questioning ceased and Pethigal left the interview room at 4:29 p.m. Thereafter, commencing at 5:05 p.m., the defendant had a brief conversation with Rivera during which the defendant expressed his concern as to why he was being taken to the booking room, and Rivera and Pethigal explained that they could not speak with him because he had invoked his right to counsel. At 5:08 p.m., the defendant was placed in handcuffs and taken out of the room to be processed.

At the hearing on the motion to suppress, Rykowski testified that Rivera had informed him that, when the defendant "was being processed, he expressed his desire to continue to talk to me. So, once the processing

of [the defendant] was complete . . . I asked that he be put back in that interview room . . . to confirm the information that . . . Rivera had given [to] me." As we have indicated, the defendant's overture to Rivera was not recorded.

At 5:25 p.m., Rykowski reentered the interview room and asked the defendant, who, by then, had been returned to that room, to clarify whether he wanted to speak with the police again. The following colloquy took place:

"[Rykowski]: Deykevious, I just want to make sure I understand, do you want to talk to us again right now?

"[The Defendant]: I do 'cause I didn't even do anything. I don't understand why you guys are saying that I murdered someone. I didn't murder anyone.

"[Rykowski]: Ok, so, as I mentioned before, you asked about an attorney before.

"[The Defendant]: Only because I was scared. This is serious.

"[Rykowski]: Ok, I just wanna understand. Do you want to talk to us right now, without an attorney?

"[The Defendant]: If it helps clear stuff up.

"[Rykowski]: I mean, obviously, I want to get your side of this.

"[The Defendant]: But listen, if I could talk to you guys and you guys can see that I really have nothing to do with this, yes I will talk to you. My dad can clarify everything that I've been doing.

"[Rykowski]: No problem. I want to talk to you, ok?

"[The Defendant]: . . . I just turned eighteen yesterday, this is my life, I'm trying to do good and now everything messes up.

"[Rykowski]: Right . . . let me bring your father back in, we gotta go over those forms again, alright?

"[The Defendant]: Ok.

"[Rykowski]: If you want to, I'm not pushing you to talk to me.

"[The Defendant]: I want to cause I don't wanna go to jail for something I didn't do."

Following that brief discussion, Rykowski explained that he would be readvising the defendant of his *Miranda* rights. At 5:38 p.m., those rights were read to him again, and he reviewed and signed the waiver of rights form. After that, interrogation resumed.

On the basis of Rykowski's testimony, which the court expressly credited, and the court's review of the video recording of the defendant's police interview, the court found that, "[w]hen the defendant [was] presented for booking, he indicate[d] to . . . Rivera that

he [wanted] to speak with the detectives. This information [was] brought to . . . Rykowski, who question[ed] the defendant about the request. The defendant indicate[d] that he [did want to talk] . . . if it would help. . . . Rykowski continue[d] to inquire about his desire to speak without a lawyer present. The defendant [was] again advised of his *Miranda* rights and waive[d] them." The court further stated: "The evidence indicates that [when] a lawyer was requested, questioning by the police ceased. The defendant requested further discussion, first with the officer [who] took him to booking and then to . . . Rykowski in the interview room and recorded on state's exhibit 1. Initiation can be said to represent a desire by a suspect to open up a more generalized discussion related to the investigation. . . . The court finds that the defendant initiated the continued communication with the police."

We conclude that the record fully supports the court's finding that the defendant initiated further communication with the police of his own accord. Although the defendant's discussion with Rivera during the booking process was not recorded, the court found credible Rykowski's testimony that the defendant told Rivera that he wanted to speak with the police notwithstanding his earlier invocation of his right to counsel, and we will not second-guess the court's credibility determination. See *State* v. *Shin*, 193 Conn. App. 348, 359, 219 A.3d 432 ("[b]ecause it is the sole province of the trier of fact to assess the credibility of witnesses, it is not our role to second-guess such credibility determinations" (internal quotation marks omitted)), cert. denied, 333 Conn. 943, 219 A.3d 374 (2019). Indeed, the defendant does not challenge the accuracy or truthfulness of Rykowski's testimony regarding the defendant's conversation with Rivera in the booking room, which plainly established that the defendant had decided to resume speaking to the police without counsel present. Nor does he contest that the statements he made to Rykowski in the interview room confirm those that he had made only moments before to Rivera. See *United States* v. *Carpentino*, 948 F.3d 10, 22 (1st Cir. 2020) ("a suspect opens the door to further questioning if his comments 'evince . . . a willingness and a desire for a generalized discussion about the investigation' "); see also *Oregon* v. *Bradshaw*, supra, 462 U.S. 1045–46 (no *Edwards* violation when accused initiated further conversation with police by inquiring as to what would be happening to him, which evinced "willingness and a desire for a generalized discussion about the investigation . . . [and] was not merely a necessary inquiry arising out of the incidents of the custodial relationship").

It is the defendant's position, nevertheless, that the conduct of the police just prior to the defendant's departure from the interview room to be booked and immediately after he was returned to the interview room supports his claim that "the officers should have known

their actions and statements, which occurred after Pethigal left the room, were likely to get him to talk without an attorney." Specifically, he points to the facts that the police removed his father from the room and left the defendant alone there for thirty minutes without providing him with any means to contact an attorney; the officers made statements suggesting that the "defendant could have helped himself if he spoke to them, but because he [had] asked for an attorney, they were booking him for murder";[22] and the officers' statements suggested that the defendant's situation could well improve if he spoke with the police at that time. The defendant further alleges that "[t]heir persistent statements that they needed to talk to him coupled with confronting him with the evidence against him undoubtedly wore [him] down until he agreed to talk without an attorney." According to the defendant, under these circumstances, the court incorrectly concluded that the defendant knowingly and voluntarily initiated further communication with the police. We are not persuaded by the defendant's argument.

First, the defendant has provided no authority for the proposition that the officers were required to provide him with an attorney or a means to contact one during the thirty minutes he was left alone in the interview room. Indeed, the defendant did not ask the police for permission to contact anyone, and his father was at the police station and had visited with the defendant. Moreover, the record does not bear out the defendant's contention of persistent statements by the officers that they wanted to talk to the defendant, and the brief outline of the incriminating evidence that the police gave the defendant was made in response to a question from the defendant himself as to why he was being held for murder.

The defendant's reliance on *State* v. *Gonzalez*, supra, 302 Conn. 287, and *Martinez* v. *Cate*, 903 F.3d 982 (9th Cir. 2018), to support his claim that the statements of the police constituted interrogation is misplaced because those cases are distinguishable from the present case. In *Gonzalez*,[23] our Supreme Court held that the statement of a police sergeant to the defendant, who was in custody but had not been advised of his *Miranda* rights, "that it was the defendant's opportunity to tell his side of the story was the functional equivalent of interrogation because the police should have known that the phrase was reasonably likely to invite the defendant to respond by making possibly incriminating statements." *State* v. *Gonzalez*, supra, 299. The court in *Gonzalez* concluded that "at the onset of the interview the police improperly subjected the defendant to custodial interrogation without the benefit of *Miranda* warnings"; (emphasis omitted) id., 301; and that the defendant's "request to remain silent was not scrupulously honored because no steps were undertaken to conclude the interrogation or belatedly advise the defendant of

his *Miranda* rights." Id., 302. In contrast, in the present case, the defendant was informed of his *Miranda* rights when the interview commenced and signed a waiver of rights form, and the police stopped questioning him after he invoked his right to counsel just prior to being removed from the interview room for booking.

*Martinez* is similarly inapposite to the present case. In *Martinez*, after the petitioner had requested that an attorney be present during his questioning by the police regarding a shooting incident, a detective stated: "All I wanted was your side of the story. That's it. O[k]. So, I'm pretty much done with you then. Um, I guess I don't know another option but to go ahead and book you. O[k]. Because . . . [you're] going to be booked for murder because I only got one side of the story. O[k]." (Footnote omitted; internal quotation marks omitted.) *Martinez* v. *Cate*, supra, 903 F.3d 988. The United States Court of Appeals for the Ninth Circuit held that the detective's statements constituted interrogation because the detective, by virtue of those statements, suggested that the petitioner might not be charged if he spoke to the police and gave them his side of the story. Id., 994–95. Accordingly, the detective's statements were " 'reasonably likely to elicit an incriminating response.' " Id., 995.

In the present case, the defendant was informed at 3:35 p.m., while he was being interviewed and long before he invoked his right to counsel, that he was under arrest for murder. Consequently, this case does not involve a situation in which the police suggested that the defendant was being arrested and booked only because he would not talk to them without an attorney.[24] See *Rodriguez* v. *McDonald*, supra, 872 F.3d 924 ("by suggesting to [the petitioner] that he would be imminently charged with murder but that cooperation would result in more lenient treatment from the court, the probation office, and from the police themselves, the officers 'effectively told [the petitioner] he would be penalized if he exercised rights guaranteed to him under the [c]onstitution of the United States' "). On the contrary, in the present case, the court expressly found that "there [was] no evidence . . . that there are any police tactics designed to deflect the defendant from clearly invoking his right to counsel . . . ."

We conclude that the record supports the court's findings with respect to the officers' statements, which must be examined in the context in which they were made. When the defendant was informed that he was under arrest and about to be booked for murder, he became very upset, started crying, stated that he didn't do anything wrong and asked why he was being arrested. In response to *the defendant's* questions, he was informed that, because he had requested an attorney, the police could no longer speak with him. Within a very short period of time, at 5:08 p.m., he was placed

in handcuffs and taken out of the interview room for booking. Only after this break in questioning did the defendant initiate further communication with the police, telling them that he again wanted to speak to them. See *Martinez* v. *Cate*, supra, 903 F.3d 997 ("[i]n every other case where the Supreme Court has held that a defendant initiated the communication with the police, there was some break in questioning"). The defendant's claim, which essentially ignores his own statements to the police, is unavailing.[25]

B

We next must determine whether the defendant's second waiver of his right to counsel was valid because he relinquished that right knowingly, intelligently, and voluntarily. The defendant contends that, even if he initiated the conversation with the police, his subsequent statement acknowledging that he was in the Ford Escape on the day of the shooting should have been suppressed because it was the product of police coercion and, consequently, not made knowingly and voluntarily. We disagree.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernandez*, 52 Conn. App. 599, 610, 728 A.2d 1, cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 145 L. Ed. 2d 272 (1999). "In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver. . . . Factors used to assess the totality of the circumstances include the age of the accused, the extent of his education, evidence concerning advisement of constitutional rights and the length and nature of the interrogation." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, 137 Conn. App. 520, 531, 48 A.3d 748, cert. denied, 307 Conn.

914, 54 A.3d 179 (2012). With respect to voluntariness, the "test . . . is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined . . . ." (Internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 290, 897 A.2d 554 (2006). In other words, "[a] statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Fernandez*, supra, 612.

In finding that the defendant made a knowing, intelligent and voluntary waiver of his rights, the court examined the totality of the circumstances and found as follows: "[T]he defendant was eighteen years [old], he had been through the eleventh grade, [and he] was able to read and write. There was no indication that the defendant was under the influence of any type of substance, be it alcohol, narcotics, or that he was in any other way impaired. He was advised of his rights not once, but twice, and each time he initialed each of the rights acknowledging that right, and then finally signed off at the end indicating he was willing to speak with the officers.

"There was no evidence of threats or physical force to coerce him to waive his rights or to make a statement. In fact, the entire tenor of the interview [of] the defendant was completely conversational and generally lacked confrontation. The defendant had his father present the two times that he was advised of his rights and waived them. His father gave parental consent on both occasions. The evidence established that he understood those rights from his own comment. He asked if it was possible to get a lawyer the first time. It was the exercise of those rights which leads the court to infer that he understood them." The court further noted that the defendant had prior experience with law enforcement, such that he was not "a novice to the advisement process," and that, even though he was emotional, "there [was] no evidence that his emotion prevented him from understanding his rights."

The court also examined other factors, stating: "[T]here was no evidence presented that the defendant was lacking in intelligence or suffered from a mental deficiency, or that intellectual limitations influenced his judgment at the time he was with . . . Rykowski and Pethigal. . . . There was nothing in the evidence for the court to conclude that the defendant was sleep deprived or in need of food or bathroom relief. The record indicates [that] the defendant was given drink, offered food, and [given the] opportunity to make bathroom visits. During the time that [the defendant] was being interviewed by . . . Rykowski, there was no indication [that] the defendant was subjected to any

exhausting or incessant questioning or treatment." The court concluded that there was nothing in the record to substantiate the claim that the police had overborne the defendant's will or that his statements were not otherwise the product "of his free, considered, and unconstrained choice." Accordingly, the court rejected the defendant's claim that his waiver was involuntary because it was based on police pressure, intimidation or manipulation.

We agree with the state that, under the totality of the circumstances, there is substantial evidence to support the court's finding that the defendant's waiver of his *Miranda* rights was voluntary and intelligent, as required by *Edwards*. The record shows that the defendant twice signed a waiver of rights form after being advised of his *Miranda* rights. See *State* v. *Miller*, supra, 137 Conn. App. 530 ("[a] defendant's express written and oral waiver is strong proof that the waiver is valid" (internal quotation marks omitted)). Moreover, our careful examination of the record reveals that it supports the court's determination that there was no showing that the police threatened the defendant or employed other coercive or improper tactics to obtain the waiver. See *State* v. *Madera*, 210 Conn. 22, 49–50, 554 A.2d 263 (1989) ("court correctly factored into its determination of the *Miranda* issue that there was 'no evidence that the defendant was in any way threatened, intimidated, coerced or abused' ").

We disagree with the defendant's argument that the fact that he had just turned eighteen years old the day before the interrogation requires a different conclusion. As the court found, the defendant had an eleventh grade education, could read and write, was not impaired in any way, signed two waiver of rights forms after having been informed, twice, of his *Miranda* rights, and, after previously having agreed to speak with police, asserted his right to counsel. His assertion of his right to counsel, after having been advised of his *Miranda* rights the first time, was a clear indication that he understood those rights. See *State* v. *Mercer*, 208 Conn. 52, 71, 544 A.2d 611 (1988) ("[W]e have held that the assertion of the right to remain silent after an initial willingness to speak with police is a strong indication that the defendant understood his rights. . . . The initial invocation of the right to counsel similarly serves to demonstrate that a defendant acted knowingly and intelligently in subsequently deciding to waive that right." (Citation omitted; internal quotation marks omitted.)); *Pickens* v. *Gibson*, 206 F.3d 988, 995 (10th Cir. 2000) ("[p]etitioner's initial refusal to make a statement and his request for an attorney indicate he 'understood . . . both the nature and consequences of his right to remain silent and his right to counsel' "); *United States* v. *Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989) ("[the defendant] evidently understood the import of the *Miranda* warnings . . . because she invoked her right to counsel

[one-half hour] before she made her incriminating statements"), cert. denied, 494 U.S. 1017, 110 S. Ct. 1321, 108 L. Ed. 2d 497 (1990); see also *State* v. *Fernandez*, supra, 52 Conn. App. 611 (waiver was not invalid when defendant "was eighteen years old at the time of the incident . . . had completed the tenth grade, [and] testified that he knew how to read and write English").

We also are not persuaded by the defendant's contention that the court was required to find that his will was overborne because the police failed to contact a lawyer for him and, for a period of time, left him alone in the interview room, separated from his father. Although the surroundings and circumstances of the defendant's interview by the police—including the fact that he knew that he was being arrested and booked for murder—were hardly comfortable, that simply does not mean that the defendant necessarily was unable to decide for himself, in an informed and unconstrained manner, whether to resume speaking to the police without a lawyer.

We therefore conclude, in light of all of the relevant facts adduced at the suppression hearing, that the state has met its burden of demonstrating a knowing, intelligent and voluntary waiver by the defendant of his *Miranda* rights. See *United States* v. *Carpentino*, supra, 948 F.3d 26 (knowing and voluntary waiver of *Miranda* rights by defendant when he initiated second phase of custodial interview, was told by troopers that questioning would stop if he wanted to talk with his lawyer, troopers read defendant his *Miranda* rights twice, and defendant confirmed that he understood those rights, signed waiver of rights form and agreed to speak with troopers). Accordingly, the defendant has not established that he was entitled to have his statements excluded due to police coercion or intimidation.

C

Finally, the state argues that, even if a violation of the defendant's *Miranda* rights had occurred, any error in the court's admission of Rykowski's testimony regarding the defendant's acknowledgment that he was in the Ford Escape on the day of the shooting and his identification of the intended victim as a rival gang member was harmless beyond a reasonable doubt. Even though we find no *Miranda* violation, we, nevertheless, address the harmless error argument. In support of its contention, the state maintains that the other evidence of the defendant's guilt was overwhelming, such that that testimony had no material bearing on the jury verdict. The defendant asserts that the challenged evidence was harmful because there was no eyewitness testimony identifying him as the shooter, there was no physical evidence confirming his presence in the Ford Escape at the time of the incident, the witnesses who implicated the defendant in the shooting had a motivation to do so, and the testimony of Shaw and Jonathan Vellon

contained inconsistencies. We agree with the state.

The standard governing our review of this issue is well established. "[I]f statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine." (Internal quotation marks omitted.) *State* v. *Tony M.*, 332 Conn. 810, 822, 213 A.3d 1128 (2019). "The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . [Our Supreme Court] has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 302 Conn. 306–307. "Whether [an] error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case [and] whether the testimony was cumulative . . . ." (Internal quotation marks omitted.) *State* v. *Tony M.*, supra, 822.

In the present case, there was compelling independent evidence that the defendant was a passenger in the Ford Escape not only on the day of the shooting but at the time of the shooting, as well, such that the defendant's statement to Rykowski acknowledging that he was in the vehicle that day was merely cumulative. At trial, Simpson and Shaw, who were in the Ford Escape when the shooting took place, both testified that the defendant was with them in the vehicle at that time. Although Jonathan Vellon refused to identify anyone else in the vehicle in his trial testimony, including the defendant, his signed, sworn statement to the police identifying the defendant as a rear seat passenger in the vehicle at the time of the shooting was admitted into evidence as a full exhibit and read to the jury. Rykowski also testified that both Pipkin and Osvaldo Vellon had provided statements to the police identifying the defendant as a passenger in the Ford Escape when the gunshot that killed the victim was fired.

With respect to Rykowski's testimony that he believed that the defendant had told him that Johnson[26] was the intended victim of the shooting, it bears empha-

sis that, before invoking his right to counsel, the defendant—who maintained his innocence throughout his interview with the police—already had told Rykowski that he did not get along with people at Westland Street, whom he referred to as the "G's," and that he knew a person by the name of Deandre.[27] The fact that the defendant apparently told Rykowski later in the interview that Johnson was the intended victim does not establish that the defendant was present when the shooting took place because that statement itself contains no indication as to how the defendant became aware of the identity of the intended victim.[28] Because the defendant's statement to Rykowski about Johnson could very well have been based on information that the defendant learned secondhand, after the shooting incident occurred, about Johnson's identity as the intended victim, the statement was hardly persuasive evidence of the defendant's actual participation in the shooting.

Moreover, the state was not required to establish the shooter's identity for purposes of the conspiracy to commit murder charge, and the evidence was clear that, even if the defendant did not fire the gunshot that killed the victim, the gunshot was fired from the Ford Escape. In addition, the inconsistencies in the testimony of Shaw and Jonathan Vellon related to collateral issues and were inconsequential, except insofar as Jonathan Vellon testified that the defendant was not in the Ford Escape at the time of the shooting. Jonathan Vellon's trial testimony in this regard, however, was flatly contradicted by the sworn statement that he gave to the police immediately after the shooting. Because Jonathan Vellon's written statement was made so soon after the incident and was corroborated by the statements of at least four other eyewitnesses, and because he was so evasive in his trial testimony, there is a high probability that the jury credited that statement over his testimony, which could well have appeared to the jury as motivated by a desire to protect the defendant. Finally, because Simpson, Shaw and Jonathan Vellon, like all of the other witnesses, were subject to extensive cross-examination about whatever interest or motive they may have had to falsely implicate the defendant in the shooting, the jury was well aware of any such interest or motive.

For all these reasons, we conclude that the admission of Rykowski's challenged testimony had no bearing on the outcome of the defendant's trial, and, consequently, its use by the state was harmless beyond a reasonable doubt. Accordingly, the defendant is not entitled to a new trial even if the admission of the testimony was improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is

guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] The police learned that the defendant is nicknamed "Bama" because he is originally from Alabama.

[3] The operator of the Nissan Altima was identified as Jose Verdes, who also provided the police with information about the shooting.

[4] The evidentiary portion of the trial commenced on July 17, 2019.

[5] In *State* v. *Whelan*, supra, 200 Conn. 753, our Supreme Court "adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." *State* v. *Bermudez*, 341 Conn. 233, 240 n.8, 267 A.3d 44 (2021).

[6] Jonathan Vellon's brother, Osvaldo Vellon, also was called by the state as a witness, but he refused to answer any questions.

[7] Pursuant to the agreement, Simpson pleaded guilty to conspiracy to commit murder and possession of a firearm in a motor vehicle for his role in the shooting, for which he was to be sentenced to a minimum of ten years and no more than twenty-five years of incarceration. In exchange for his guilty plea, he agreed to cooperate with the state by providing information and testimony concerning the shooting and another, separate criminal case involving the defendant. See footnote 10 of this opinion.

[8] We note that, contrary to Simpson's testimony, Shaw testified that the defendant was associated with the Ave gang, which conflicted with a written statement he had given to Rykowski shortly after the incident indicating that he was not aware of any such association. Shaw explained, however, that, at the time he gave that statement, he was unaware that the defendant had any gang affiliation and that the police subsequently told him that the defendant was in a gang. Shaw further testified, contrary to Simpson's testimony, that Pipkin himself handed the gun directly to Simpson and never gave the gun to Shaw.

[9] The defendant, who did not testify at trial, adduced testimony from one witness, Karina Salcedo, an officer with the Hartford Police Department, who had responded to the scene of the shooting.

[10] The defendant's previous sixteen year sentence followed his conviction of manslaughter in the second degree and evading responsibility based on conduct by the defendant that occurred the day before the shooting incident at issue in this appeal. His conviction of those charges was upheld on appeal to this court; see *State* v. *Russaw*, 203 Conn. App. 123, 247 A.3d 614 (2021); and our Supreme Court denied the defendant's petition for certification to appeal. See *State* v. *Russaw*, 336 Conn. 933, 248 A.3d 1 (2021).

[11] Under *Golding*, a defendant may prevail on an unpreserved claim only if the record is adequate for review of the claim, the claim is of constitutional magnitude alleging the violation of a fundamental right, the alleged constitutional violation exists and deprived the defendant of a fair trial, and the state cannot demonstrate the harmlessness of the violation. See *State* v. *Golding*, supra, 213 Conn. 239–40.

[12] Although the defendant acknowledges that the question of whether the transferred intent doctrine applies to the crime of conspiracy to commit murder has not been decided by the courts of this state, he cites several cases which, he contends, support his claim that it does not. See, e.g., *State* v. *Beccia*, 199 Conn. 1, 5, 505 A.2d 683 (1986) ("Just as one cannot attempt to commit an unintentional crime . . . one cannot agree anticipatorily to accomplish an unintended result. There is just no such crime as would require proof that one intended a result that accidentally occurred." (Citation omitted; internal quotation marks omitted.)). We need not consider this issue, however, in light of our determination that the defendant's conspiracy conviction was not predicated on a theory of transferred intent.

[13] As reflected in the court's instruction on transferred intent, that doctrine "was created to apply to the situation of an accused who intended to kill a certain person and by mistake killed another. His intent is transposed from the person to whom it was directed to the person actually killed." (Internal quotation marks omitted.) *State* v. *Tutson*, 99 Conn. App. 655, 663, 915 A.2d 344 (2007).

[14] See footnote 1 of this opinion.

[15] In *Kitchens*, our Supreme Court concluded that "when the trial court

provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." *State* v. *Kitchens*, supra, 299 Conn. 482–83.

[16] Our recitation of the relevant facts is predicated on the findings of the trial court as set forth in its memorandum of decision denying the defendant's motion to suppress and on our independent review of the video recording of the police interview. Although the recording of the interview was not introduced into evidence at the defendant's trial, the state did introduce the recording at the hearing on the defendant's motion to suppress, and the court relied on the recording in denying that motion.

[17] Although the defendant had turned eighteen years old the day before, on July 18, 2017, his father was present while the defendant was being advised of his rights because Rykowski believed that it would be best to advise the defendant as a juvenile.

[18] The defendant's father did not join Rykowski and Pethigal when they reentered the interview room at this time.

[19] Sergeant Rivera's first name is not apparent from the record.

[20] The defendant did not seek to suppress any statements that he made prior to invoking his right to counsel, and those statements are not the subject of this appeal.

[21] In the present case, there is no dispute that the defendant was in custody at all relevant times.

[22] The defendant's claim concerns Pethigal's statements to the defendant that he could not speak with the defendant because the defendant had asked for an attorney and that Pethigal would "love to discuss this more" but could not in light of the defendant's request, as well as Rivera's statement: "You had your opportunity to speak to us. You requested a lawyer. We are done talking with you, sir."

[23] The defendant in *Gonzalez* had been brought to the police station for questioning about a murder. *State* v. *Gonzalez*, supra, 302 Conn. 296. "Although the defendant initially persisted in resisting being interviewed by stating that he wanted an attorney and that he would not speak to the officers, the officers only told the defendant to sit there and wait to be booked, made no effort to honor the defendant's request for counsel or to explain his rights and remained seated at the table, staring at the defendant in silence. Approximately sixty seconds later, the defendant began making the contested statements." Id., 296–97. Moreover, "once the defendant commenced narrating his activity on the day of the murder . . . the officers did not ascertain whether the defendant was waiving his prior request for counsel. The officers also never presented the defendant with a waiver of rights form that had been in their possession throughout the interview." Id., 302–303. Those facts are notably different from the facts of the present case, in which the defendant was advised twice of his *Miranda* rights and twice signed a waiver of rights form before making any incriminating statements, the officers ascertained that the defendant wanted to speak to them despite his prior request for counsel, and the officers left the interview room and the interview ceased for a period of time after the defendant's invocation of his right to counsel.

[24] This determination is supported by the fact that, later in the interview, the defendant asked: "If we clear everything up will I still have to go to jail?" In response to that question and again thereafter, Rykowski explained to the defendant that there was an active warrant for his arrest, that Rykowski could not change that fact, and that the defendant would be placed under arrest and booked at that time regardless of what he told the police about the shooting incident.

[25] We note that the defendant requested, for the first time at oral argument before this court and subsequently in a written motion filed shortly thereafter, that he be permitted to submit a supplemental brief raising an *Edwards* claim under article first, § 8, of the Connecticut constitution. See *State* v. *Purcell*, supra, 331 Conn. 362 (article first, § 8, of Connecticut constitution provides greater rights than federal constitution insofar as that state constitutional provision "requires that, if a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel" (internal quotation marks omitted)). More specifically, the defendant sought to raise and brief the claim that the

statement he made after booking that he wanted to resume speaking to the police "if it helps clear stuff up" was equivocal, thereby triggering a state constitutional duty on the part of the police to inquire further solely for the purpose of clarifying the defendant's statement. Ordinarily, we will not entertain claims raised for the first time at oral argument. See, e.g., *State v. Cicarella*, 203 Conn. App. 811, 817 n.5, 251 A.3d 94, cert. denied, 337 Conn. 902, 252 A.3d 364 (2021). Upon consideration of the defendant's request in the present case, we concluded that there was no need to address the merits of the motion in light of our determination—explained more fully in part II C of this opinion and equally applicable to a claim under the state constitution—that, even if the defendant could establish that the police violated his right to counsel by questioning him following his invocation of that right and after he had been booked, the violation would be harmless beyond a reasonable doubt due to the overwhelming independent evidence of the defendant's guilt. We therefore denied the defendant's motion to raise an *Edwards* claim under article first, § 8, of the Connecticut constitution because he could not prevail on that claim.

[26] Although Rykowski testified that the name of the intended target was Andre Johnson, the intended target was identified in the record numerous times as Deandre Johnson.

[27] Because these statements were made before the defendant indicated he wanted a lawyer, they were not the subject of the defendant's motion to suppress.

[28] Although, in his police interview and written statement, the defendant ultimately acknowledged that he was present in the Ford Escape at the time of the shooting and claimed that a passenger nicknamed "Hazy" was the shooter, the recording of the police interview and the defendant's written statement were never admitted into evidence at the defendant's criminal trial. Consequently, the jury never was apprised of that information, and, for that reason, it does not factor into our harmless error analysis.